# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 03-946

**STATE OF LOUISIANA**

**VERSUS**

**DILLON JAMES MERRITT**

**\*\*\*\*\*\*\*\*\*\***

## APPEAL FROM THE
## TENTH JUDICIAL DISTRICT COURT
## PARISH OF NATCHITOCHES, NO. C3148A
## HONORABLE ERIC R. HARRINGTON, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

## ARTHUR  J. PLANCHARD
## JUDGE
**\*\*\*\*\*\*\*\*\*\***

Court composed of Ulysses Gene Thibodeaux, Chief Judge, John D. Saunders and
Arthur J. Planchard[*], Judges.

**AFFIRMED.**

**Thibodeaux, C.J., dissents in part and assigns written reasons.**

**Van Hardin Kyzar**
**District Attorney, 10th J.D.C.**
**P. O. Box 838**
**Natchitoches, LA 71458-0838**
**Counsel for Appellee:**
    **State of Louisiana**

**Phyllis Elaine Mann**
**Post Office Box 705**
**Alexandria, LA 71309**
**Counsel for Defendant/Appellant:**
    **Dillon James Merritt**

---

[*] Judge Arthur J. Planchard, Retired, participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.

PLANCHARD, Judge[1].

Defendant, Dillon James Merritt, was charged by amended bill of information with four counts of cruelty to juveniles in violation of La.R.S. 14:93. A jury trial commenced on September 17, 2002, and on September 19, 2002, the jury found Defendant guilty as charged on all four counts. On November 18, 2002, Defendant filed a motion for a new trial and a motion for post-verdict judgment of acquittal. The trial court denied the motion for a new trial on November 19, 2002, without written reasons. A hearing on Defendant's motion for post-verdict judgment of acquittal was held on November 27, 2002, at which time the trial court denied the motion. On January 31, 2003, Defendant was sentenced to two years at hard labor each on counts one and four, and seven years at hard labor each on counts two and three. All the sentences were ordered to be served consecutively for a total term of imprisonment of eighteen years at hard labor. Defendant's motion to reconsider the sentences filed on January 31, 2003, was subsequently denied without written reasons. Defendant now appeals his convictions and sentences.

**FACTS:**

Defendant married the victim's mother, K.R., in May 2001. At the time, the victim, A.R., was two and one-half years old. On July 6, 2001, Defendant, while holding the victim's eyelids open, sprayed hair spray into her eyes, causing corneal abrasions (count #1). Subsequently, on July 14, 2001, the Defendant twisted the victim's left leg in such a manner as to cause a spiral fracture of the lower tibia (count #2). Then, on August 6, 2001, the Defendant pulled the victim's right arm back in such a manner as to fracture the bone of the upper arm (count #3). Following the latter

---

[1] Judge Arthur J. Planchard, Retired, participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.

1

two incidents, the Defendant refused to allow the victim to receive medical attention, thereby prolonging her pain and suffering from the injuries (count #4).

**ASSIGNMENTS OF ERROR:**

Defendant alleges six assignments of error. In assignments of error numbers one, two, four and five Defendant contends the evidence was insufficient to convict him of cruelty to juveniles as charged in the amended bill of information. Defendant's assignment of error number three alleges the trial court erred when it allowed the admission of certain testimony of a child abuse expert which pertained primarily to the injuries alleged in counts two and three. Finally, in assignment number six, Defendant asserts his sentences are excessive under the circumstances, and that the trial court erred when it ordered the sentences to be served consecutively.

We will address the sufficiency of the evidence first as to each of the four counts; then address whether the trial court erred when it allowed the expert witnesses' testimony and the alleged inadmissible statements' application to the sufficiency of the evidence as it pertains to counts two and three. Finally, we will address Defendant's allegation that the sentences are excessive.

**ASSIGNMENTS OF ERROR NUMBER 1, 2, 4, and 5:**

Defendant alleges that the evidence was not sufficient to sustain the verdicts of cruelty to a juvenile on each count charged in the amended bill of information, particularly since Defendant was convicted primarily on circumstantial evidence. When sufficiency of the evidence is raised on appeal, this court has held:

When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven

2

beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559, at 563 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). The role of the factfinder is to weigh the respective credibility of each witness. Therefore, the appellate court should not second guess the credibility determinations of the factfinder beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559, citing *State v. Richardson*, 425 So.2d 1228 (La.1983).

*State v. Miller,* 98-1873, p. 5 (La. App. 3 Cir. 10/13/99), 746 So.2d 118, 120, *writ denied,* 99-3259 (La. 5/5/00), 761 So.2d 541.

Additionally, in *State v. Ortiz,* 96-1609, p. 12 (La. 10/21/97), 701 So.2d 922, 930, *cert. denied*, 524 U.S. 943, 118 S.Ct. 2352 (1998), our supreme court stated:

> When circumstantial evidence is used to prove the commission of the offense, La.R.S. 15:438 requires that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." This is not a purely separate test to be applied when circumstantial evidence forms the basis of the conviction; all evidence, both direct and circumstantial must be sufficient to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt. *State v. Porretto,* 468 So.2d 1142 (La.1985).

*See also State v. Rosiere*, 488 So.2d 965(La.1986); *State v. Matthews*, 464 So.2d 298 (La.1985); and *State v. Patterson*, 295 So.2d 792 (La.1974).

Louisiana Revised Statutes 14:93(A), cruelty to juveniles, provides:

> Cruelty to juveniles is the intentional or criminally negligent mistreatment or neglect, by anyone over the age of seventeen, of any child under the age of seventeen whereby unjustifiable pain or suffering

3

is caused to said child. Lack of knowledge of the child's age shall not be a defense.

The term "intentional" in this case means a general criminal intent to cause a child unjustifiable pain and suffering and "mistreatment" means abuse. *State v. Porter*, 99-1722 (La.App. 3 Cir. 5/3/00), 761 So.2d 115.

The following are the undisputed facts established at trial:

A.R. was born December 18, 1998. A.R. was the second child of J.K.R. and K.R. The couple divorced in May 2001, after being separated for several months. A few days following the divorce proceedings, K.R. married the Defendant, and with her two daughters moved into his house. Prior to K.R.'s marriage to the Defendant, the custody arrangement between the children's father and K.R. was that she had physical custody of the children from Thursday afternoon to Sunday noon and the children's father had physical custody from Sunday noon to Thursday afternoon. There was a provision in the custody agreement that K.R. was not supposed to spend any nights with the Defendant when she had custody of the children. Following her marriage to the Defendant, starting June 2001, the physical custody arrangement of the children was changed so that from the first to the fifteenth of the month, K.R. had physical custody and from the fifteenth to the end of the month, the children's father had physical custody of the girls.

On June 11, 2001, Defendant brought the victim to her mother and told her that A.R. had fallen off her bed and hurt her foot. The child was limping and complained of a hurt foot. The next day, K.R. took A.R. to see Doctor Garland Miller at DeSoto Regional Family Medicine. A.R.'s right ankle was X-rayed but there was no notable injury to the foot. The doctor diagnosed a sprained ankle. On June 16, 2001, after the children went to their father's home, D.R., the paternal grandmother, took A.R. to

Natchitoches Parish Hospital because A.R. continued to limp. This time her left foot was X-rayed, but there appeared to be no discernable problem.

On the morning of July 7, 2001, K.R. awoke to find the Defendant in the bathroom rinsing out the victim's eyes. He told her that A.R. had sprayed herself in the face with hair spray. K.R. and Defendant took A.R. to the emergency room at Sabine Medical Center. Because of a long wait, they did not stay, but bought a bottle of *Visine* to put in her eyes. The next day, because A.R.'s eyes had become so painful and swollen she could not open them, K.R. took her back to Sabine Medical Center where A.R.'s examination revealed corneal abrasions in both eyes.

On the morning of August 6, 2001, the Defendant brought the victim to K.R. and told her A.R. hurt her shoulder when she jumped off her bed. However, he refused to allow K.R. to attend to the child. Later in the morning, K.R. called her mother, Terry Matthews. Ms. Matthews went to the Defendant's house and, after K.R. and the Defendant began to argue, attempted to remove both of the girls from the house. As Ms. Matthews was putting the children in the car the Defendant came out and began to argue with her. Ms. Matthews left without the children. Later in the day, Ms. Matthews called child protection services and the children were removed from the house. A.R. was taken to the Sabine Medical Center Emergency Room where it was discovered that, among other injuries, she had sustained a spiral fracture of the left leg and a fractured right arm.

**Count Number 1:**

Count number one of the amended bill of information alleged that on July 6, 2001, Defendant caused the victim unjustifiable pain and suffering by spraying hair spray into her eyes. In brief, Defendant argues that the State failed to prove that he

5

sprayed hair spray into A.R.'s eyes. The Defendant contends that the State did not exclude the reasonable hypothesis that A.R. sprayed herself in the face.

The victim's mother, K.R., testified she had physical custody of the children in the first two weeks of July. Upon waking up one morning, she found the Defendant rinsing A.R.'s eyes with water. He told her that A.R. had sprayed herself in the eyes with K.R.'s hair spray. He said that he found the hair spray bottle on A.R.'s bed. K.R. testified that it was a pump type of bottle of *Finesse* hair spray, not an aerosol. When asked if the pump part of the bottle had an interlocking groove, K.R. answered, "No, I don't believe it had the groove but it's still kind of difficult to push if you're little." K.R. testified that it was her suggestion to take A.R. to the emergency room.

The Defendant argues that A.R. admitted she sprayed herself in the eyes. He further argues that A.R.'s sister, H.R., also said A.R. sprayed herself. K.R. testified that at the time of the incident both of the girls told her A.R. sprayed herself. However, K.R. further testified that after the children were removed from the household they began to tell her a different version of the incident:

> A. Yes, now that I'm dealing with them. . .now that we are away from Dillon, [A.R.] says a different (inaudible) of her story.
>
> Q. Okay. She told you what happened didn't she?
>
> A. Yes. She's actually told me that Dillon had held her eyes opened and sprayed hair spray in them.

Although, other than K.R.'s testimony, there was no direct evidence presented at trial that it was the Defendant who sprayed hair spray into A.R.'s eyes, we find that it was reasonable for the jury to have inferred from the circumstances that the Defendant committed the crime. In *Porter*, 761 So.2d 115, 123-24 (emphasis added), this court held:

6

Circumstantial evidence consists of the proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. *State v. Guillory*, 670 So.2d [301,] at 304, citing *State v. Donahue*, 572 So.2d 255 (La.App. 1 Cir.1990). The circumstantial evidence rule does not require the State to exclude every possible theory of innocence, but only the reasonable hypotheses of innocence. *State v. Lilly*, 468 So.2d 1154 (La.1985). In circumstantial evidence cases, this court does not determine whether another possible hypothesis suggested by a defendant could afford an exculpatory explanation of the events. Rather, this court, evaluating the evidence in the light most favorable to the prosecution, determines whether the possible alternative hypothesis is sufficiently reasonable that a rational juror *could not have found* proof of guilt beyond a reasonable doubt under *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). *State v. Davis*, 92-1623 (La.5/23/94); 637 So.2d 1012, *certiorari denied*, 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359 (1994).

The jury heard testimony that all of the injuries Defendant was accused of inflicting occurred during the time A.R. was in her mother's custody and in the Defendant's home. The custody arrangement had been changed starting the first of June. The victim lived in the Defendant's house for three months, June, July, and August; therefore, there were three periods of two week visitation, and in each period A.R. suffered a painful injury. Each time it was the Defendant who discovered the victim was injured, and each time the Defendant blamed the victim for causing her own injury. The extent of A.R.'s injury to her eyes was substantiated by the records from Sabine Medical Center. Moreover, K.R. testified that A.R. told her that the Defendant sprayed her in the eyes with the hair spray. Defendant did not object to this testimony. Furthermore, the jury heard convincing testimony of two doctors (argued below) that the injuries to A.R.'s leg and shoulder were most likely caused by non-accidental trauma, rather than by falling off her bed.

In evaluating the evidence in the light most favorable to the State, we find that Defendant's hypothesis was not sufficiently plausible under the circumstances that a rational juror could have found the State failed to prove its case beyond a reasonable

7

doubt. The jury was reasonable when it discarded Defendant's hypothesis that it was A.R. who caused her own injury by spraying herself in the face with hair spray and found the Defendant guilty beyond a reasonable doubt. This claim is without merit.

**Count Numbers 2 and 3:**

Count number two of the amended bill of information alleged that on July 14, 2001, the Defendant caused the victim unjustifiable pain and suffering by twisting her left leg in a manner that resulted in a spiral fracture of her leg. Count number three alleged that on August 6, 2001, Defendant caused the victim unjustifiable pain and suffering when he twisted the victim's right arm in such a manner as to result in damage to her shoulder of such magnitude that surgery was required.

Doctor Geoffrey Collins, an orthopedic surgeon, saw A.R. the day following her admission to the emergency room. He testified that on August 7, 2001, he was contacted by Sabine Medical Center to see and treat the victim. Doctor Geoffrey described A.R. when he first saw her as follows:

> When she arrived there uh, immediately appeared to me that uh, [A.R.] was not in overall good condition. Uh, she had what appeared to be a blood clot in the square of her eye so the lateral aspect of her eye was obliterated by blood. Uh, she had rashes behind both ears. Uh, she had some scratches on her thigh. Uh, she was refusing to move her right arm and uh, she was uh, very resistant to any motion or palpation of her left lower leg.

Regarding the victim's left leg, the doctor further stated:

> Uh, the x-rays of her left lower leg indicated she had a long spiral fracture of the uh, left tibia. Uh, that fracture did not appear to be new. There was some bone formation there indicating that that [sic] fracture uh, had been there for somewhere in the neighbor hood of two to four weeks.

In regard to the shoulder injury, the doctor testified:

> After we finished our exam we repeated the x-rays and uh, the x-rays were uh consistent with a right proximal humerus growth plate injury with displacement.

8

. . . .

> The right proximal humerus is the top of the arm bone right up at the top. There's a growth center there that gives you the length of your arm and her injury was through that growth center at the top of the arm right below the ball of the shoulder.

The doctor further testified:

> Uh, I felt that uh, her basic diagnosis, her definitive diagnosis was a right proximal humerus growth plate injury a left tibia fracture–two injuries that occurred on different days. Uh, and I diagnosed her with one or both of either being uh, poorly taken care of or abused based on the nature of her leg injury and two injuries, significant injuries of various ages.

The doctor performed immediate surgery inserting metal pins into the shaft of the long bone and then into the ball joint of the shoulder in order to realign and affix the growth plate. He also set and placed a permanent cast on the victim's leg. When asked if he had an opinion about the cause of the injuries, the doctor testified as follows:

> A. I think in my report uh, fairly clearly on 8-7 of 2001 impression reads – my impression is that [A.R.] is clearly a product of neglect and or abuse resulting in the left spiral tibial shaft fracture and a right proximal humeral ficial injury. That was my impression of that visit.

> Q. Under all the circumstances that you're aware of uh, do these injuries uh, appear to you to be consistent with child abuse?

> A. Any time–they have two factors that make me think so. The first is a very young child with a long bone spiral fracture is a major red flag for abuse. On top of that, two injuries at different ages is a second major red flag for abuse.

On cross-examination, the doctor stated that it is possible the injury could have resulted by another mechanism other than abuse, such as the foot getting stuck in a piece of furniture and fracturing as the child twisted somehow. The doctor further speculated that there were two injuries to A.R.'s leg, one that occurred two to four weeks prior to his seeing her and one that occurred more recently which was the cause

9

of the immediate pain she was experiencing during the examination. Moreover, the doctor testified that it was highly unlikely the two injuries to A.R.'s leg would have occurred in the same way, particularly from a fall from a high place such as a bunk bed. He further stated that, generally, this type of fall would cause a buckle fracture rather than a spiral fracture. With regard to the shoulder injury, the doctor testified that the injury could have occurred if A.R. had fallen from the top of a bunk bed.

K.R. testified that the two girls slept together in a bunk bed. The bed was the type that has a full size mattress on the bottom and a single mattress on the top bunk. However, the bunk bed in the girls room had neither a mattress nor a platform for a mattress on the top position, rather it had just a bar where a platform could be placed. She further testified that although A.R.'s sister could climb to the top of the bunk bed, A.R. could not.

Doctor Ann Springer, a pediatrician and an expert in the field of child abuse medicine, testified she saw A.R. on August 15, 2001. Regarding the injuries to A.R.'s leg and shoulder, Doctor Springer's description of the injuries was essentially the same as Doctor Collins'. Doctor Springer testified that during the examination she asked A.R. what happen. When asked what A.R. told her, the doctor testified:

> A. She said that uh, her right arm was lifted and pulled back hard and she also said that her leg had been twisted.

> Q. Did she give you any indication of how many times?

> A. Twice on the leg.

> Q. Did she tell you who had done this?

> A. Yes.

> Q. Who did she tell you had done it?

> A. She said her stepfather.

10

It is this portion of Doctor Springer's testimony that Defendant argues was inadmissible pursuant to La.C.E. art. 803(4), whereas she was not the victim's treating physician. This assignment is addressed at length below.

The doctor testified that the two fractures, that of the shoulder and the leg, required significant force to inflict, "comparable to an automobile accident." She testified that they were life-threatening injuries. She further testified that a strong adult male could exert enough force to cause the fracture to A.R.'s leg. Finally, the doctor testified that, in her opinion, there was no other reasonable hypothesis to explain A.R.'s injuries other than that they were inflicted on purpose.

Finally, K.R. testified that A.R. told her that the Defendant hurt her. "'Dillion did my arm like this.' And she bent her arm back." The Defendant did not object to this testimony.

Again, we find the evidence, both direct and circumstantial, was sufficient for the jury to reasonably conclude that the Defendant caused the two above described injuries. In *State v. Lott*, 535 So.2d 963 (La.App. 2 Cir. 1988), the second circuit stated:

> Exclusion of every reasonable hypothesis of innocence is a component of the more comprehensive reasonable doubt standard, when circumstantial evidence is used to convict. Thus, the circumstantial evidence rule may not establish a stricter standard of review than the more general *Jackson v. Virginia* formula; but, a hypothesis of innocence that is sufficiently reasonable and sufficiently strong must necessarily lead a rational factfinder to entertain a reasonable doubt about guilt. See *United States v. Bell*, 678 F.2d 547 (5th Cir. 1982); *State v. Sutton, supra* [426 So.2d 471(La. 1983)].

*Id.* at 966.

Defendant argues that the State did not exclude the reasonable hypothesis that A.R. injured her leg and shoulder when she jumped or fell off the bed. When a case involves circumstantial evidence, and the trier of fact reasonably rejects the

11

hypothesis, the defendant is guilty unless he can offer another hypothesis which would raise a reasonable doubt. Considering the totality of the circumstances, we find the evidence offered by the State was sufficient to rule out any theory of accidental injury. At the time of the injuries, A.R. was two and one-half years old. Her mother testified that A.R. could not have climbed to the top of the bunk bed. Doctor Collins testified that while it was possible for a child to incur such injuries in a fall from the top of a bunk bed, he opined that for both injuries to happen at the same time was highly unlikely. Doctor Springer testified A.R. told her that her stepfather caused the injuries. This testimony was corroborated by K.R., who testified A.R. told her the Defendant sprayed hair spray in her eyes, and pulled her arm back. Moreover, the record demonstrates that the Defendant exhibited a guilty state of mind when he and K.R. followed A.R. to the hospital.

Joyce Reliford, a child protection investigator with the Department of Social Services, Office of Community Services, was one of the social workers who went to the Defendant's house on August 6, 2001, and took custody of the children. She transported A.R. to the emergency room, where the Defendant and K.R. arrived shortly thereafter. Ms. Reliford testified the Defendant raised a ruckus at the hospital. She said:

> Frankly he was quite obnoxious and saying–well, he was saying a lot of things like uh, there was nothing wrong with her when she left the house. Y'all could have done something to her. You know, and whose to say y'all didn't hurt her and you know, things of that nature. And uh, he sort of taunted the foster mother who was real excitable and she was afraid.

K.R. testified:

> When I was in the Emergency Room I had started calming down because I knew the girls were there and the doctor was coming back and forth and talking to me and everything so I started calming down. He kept coming in the Emergency Room talking about act like you're really

12

upset and act like you can't talk and this, that and the other. And I kept asking him why, you know, I'm fine. I'm talking to the doctor's [sic] and everything and then after um, they got me calmed down, Dillon–I wanted to leave and just, you know, handle everything the right way and he kept wanting me to go back in there and go into the hospital room and just take [A.R.] So he kept on and kept on so I finally just went to the room where the O.C.S. ladies were with the kids. And I went up to [A.R.] and picked her up and uh, they told me, you know I couldn't do that so–he was throwing a fit at the hospital. The cops had to make him leave and everything.

In light of the direct and circumstantial evidence offered by the State, the hypothesis Defendant offered, that A.R. injured herself when she jumped or fell off the bed, was not sufficiently strong enough to cause a rational factfinder to entertain a reasonable doubt about Defendant's guilt. Accordingly, these claims are without merit.

**Count Number 4:**

Count number four of the amended bill of information alleged that on August 6, 2001, Defendant caused the victim unjustifiable pain and suffering by refusing to allow her to receive necessary medical treatment. In brief, Defendant asserts that he was not aware of the nature and extent of the injuries. Defendant supports this assertion by pointing out that none of the other adults who came in contact with A.R. on August 6, 2001, were aware of the nature and extent of the injuries. The Defendant argues:

> [K.R.], Terry Matthews, Deputy Polk, all testified that they could have taken [A.R.] to get medical treatment on August 6, 2001, and that they did not do so because they did not believe [A.R.] needed emergency medical treatment.

Therefore, Defendant concludes it was reasonable that "this inexperienced stepfather, who had only been married to the mother of these children for three months at the time of A.R.'s injury, did not perceive the need to get immediate medical treatment for the child."

13

In order to convict for cruelty to a juvenile by means of denying the child access to medical care, the State had to prove that the Defendant had the general criminal intent to cause A.R. unjustifiable pain or suffering, or alternatively, to show that the Defendant's conduct amounted to a gross deviation below the standard of care such that it constituted criminally negligent mistreatment of the child. *State v. Cortez*, 96-859 (La.App. 3 Cir. 12/18/96), 687 So.2d 515.

K.R. testified that although the Defendant brought her A.R. and told her A.R. had hurt herself when she jumped off the bed, he refused to let her near the child. K.R. testified that "I could tell the way that her arm looked something in her arm was broke or something because [her] elbow was just flopping over." K.R. told him she wanted to examine A.R., that she thought A.R.'s "elbow or something was dislocated." Instead, the Defendant insisted on bathing A.R. K.R. stated that "I could see where he wasn't gonna let me get near her." So she called her mother for help.

Terry Matthews, K.R.'s mother, testified that in late morning of August 6, 2001, she received a call from her daughter. As a result of the call, Ms. Matthews immediately went to the Defendant's house. After she arrived, a fight ensued between the Defendant and K.R. While they were arguing, Ms. Matthews found A.R. in bed. She testified that she had seen A.R. the evening before, and that at that time she was fine. She stated that she took A.R. in her arms and immediately noticed something was wrong with her shoulder. Ms. Matthews testified she sat on the couch for a few minutes with A.R. on her lap as the arguing continued, then she decided to take the children back to her house. As she was getting into the car with the girls, Defendant came out and demanded that she leave and not take the girls. She stated she argued with the Defendant, but left without the girls after K.R. told her "'Momma, I'm gonna go ahead and stay and leave the kids here with me.'" Ms. Matthews testified that

14

although she knew there was a medical problem, she did not think it was an emergency. She stated that if she had believed the medical problem was serious, she would have called 911 as soon as she got home. However, a short time later, after she spoke with Deputy Polk, Matthews called the Department of Social Services.

After Ms. Matthews left Defendant's house, the Defendant called the police and reported a domestic disturbance. Doryce Polk, a deputy with Natchitoches Parish Sheriff's Office, responded to the Defendant's phone call. Deputy Polk testified that when she arrived A.R. was sitting on the couch with her mother. She further testified that as soon as she saw A.R. she knew something was wrong with the child. When she asked if everything was okay, everyone responded in the affirmative, except for A.R., who started to cry and shook her head "no." She stated K.R. told her that A.R. had been crying all day. Deputy Polk's immediate response was to ask the Defendant what had he done to A.R. Deputy Polk admitted that had she thought the child was in immediate danger she would have taken some action at the time. However, she explained she was not called to the residence because of a problem with the children. She testified that before she left, she asked again if everything was all right and this time A.R. nodded her head "yes." Defendant told the deputy he called because he did not want Ms. Mathews to come to his house anymore. Deputy Polk went to Ms. Matthews' house. After talking to Ms. Matthews, she advised her to call social services.

Defendant argues that after two police officers and two social workers arrived at his house at approximately four o'clock in the afternoon, he did not refuse to give A.R. to the social worker. Deputy Polk testified that Defendant answered "no" when asked to give the child to the social worker, Joyce Reliford, but instead handed her to her mother, who did hand A.R. over to the social workers. Ms. Reliford testified that

they were met with "great opposition, of course, but we were able to with law enforcement assistance, get the two children out of the house." She stated that the Defendant "put up quite a verbal fight about us being there."

Defendant relies on *Cortez*, 687 So.2d 515, to bolster his contention that there was insufficient evidence to support a finding that he intentionally or negligently withheld medical treatment. In *Cortez*, the defendant was found guilty of cruelty to a juvenile for denying him access to medical treatment when, during a visit to a pediatrician because of an ear infection, it was discovered the six-month-old boy had a severely injured leg. This court overturned Cortez's conviction.

In *Cortez*, this court found that evidence established the injury was such that it did not require immediate treatment. Testimony established that the type of injury, or its severity, may not have been noticed or diagnosed by the average care giver. The treating physician testified that he would not have expected a parent to be able to recognize or diagnose that type of injury. *Id.* This court stated:

> In addition, Ms. Cortez could only be expected to seek treatment appropriate to a condition when she is, or should be aware of the nature or extent of the problem. As she had suspected, and for which she sought treatment, Hayden was suffering from an ear infection. Therefore, it is plausible, reasonable, and possible that this inexperienced mother perceived Hayden's irritability or discomfort to be related to that condition.

*Id.* at 520.

In *Cortez*, the evidence showed that twenty-four percent "of these injuries occur in children who sustain mild to moderate trauma, or in situations when the mechanism of the injury is unclear. Furthermore, the textbook stated that while 50% of these injuries stem from motor vehicle or pedestrian accidents, other causes include falls and athletic injuries." *Id.* at 521. This court found that in light of the fact the doctor testified he had never seen this type of injury before, the speculation of the injury's

16

genesis was not sufficient to exclude every reasonable hypothesis of Cortez's innocence.

Finally, in *Cortez*, this court stated:

First, the state's case is replete with material inconsistencies. There are inconsistencies presented by the doctors themselves regarding the visibility of the injury or a parent's ability to recognize this type of injury. Second, there are no other signs indicating that this child may have been abused, i.e. bruises, lacerations, bumps, or other trauma. There was no testimony presented regarding the mother's ill treatment of her child, or her failure to provide adequate care. Furthermore, the evidence shows that many people handled this baby throughout the time the injury may have occurred. In fact, the evidence showed that the person who spent the *least* amount of time with him during the period of injury was Ms. Cortez. In addition, the evidence presented clearly shows that the baby was not deprived of any medical treatment by the possible delay in seeking treatment, of anywhere between one to ten days, as he did not receive or require any emergency treatment, other than mild pain medication, for the seven days he remained at Moosa and before being transferred. Alarmingly, this court can find no other convictions brought under this statute, offering such minimal acts and potentially justifiable behavior on the part of a defendant, such as in the case *sub judice*. (Emphasis in original).

*Id.* at 522.

In contrast, in the instant case, K.R., Ms. Matthews, and Deputy Polk all testified they could immediately see that A.R. was in distress. Joyce Reliford and Sandra Doolittle, social workers with the Department of Social Services, Office of Community Services, both testified that they could see there was a problem with A.R. as soon as they looked at her. Ms. Reliford testified that it was obvious from just looking at A.R. that she was in pain. Defendant's response to A.R.'s distress had been to keep her away from her mother and to bathe her.

The two social workers took A.R. to emergency services where she received a temporary cast on her leg and a sling for her arm. An appointment was arranged for the next morning with an orthopedic surgeon, Doctor Geoffrey Collins. Doctor Collins testified that A.R. had pain with any motion or palpation of her right shoulder

and "she did not allow full motion of that left knee secondary to pain below the knee level." Following the examination, A.R. was taken to the hospital where Doctor Collins performed emergency surgery on her shoulder "to try and–and prevent any significant damage to the growth cells of that growth plate." Doctor Ann Springer testified that A.R.'s injuries were potentially life threatening: "These kinds of injuries require a significant force to inflict comparable to an automobile accident. . . .two serious fractures; uh, fractures like this can uh, lead to fatal infection."

While Defendant argues that none of the other adults who came into contact with A.R. on August 6, 2002, thought that A.R. required emergency treatment, whether or not the child's injuries could be classified as requiring emergency treatment is not an element of the offense; rather what had to be proven is that Defendant intentionally or negligently and without justification prolonged A.R.'s pain and suffering by refusing medical attention. The record clearly establishes that there was sufficient evidence before the jury supporting its finding that the Defendant unjustifiably prolonged A.R.'s suffering by first not allowing her mother to care for her, by not allowing Ms. Matthews to take A.R. home, by telling Officer Polk that A.R. was okay, and by initially refusing to allow the social workers to take A.R. There was testimony that A.R. was crying most of the day and that she would not move her arm. According to the testimony the injury occurred at approximately nine-thirty in the morning and A.R. was not taken to the emergency room of the hospital until after four o'clock in the afternoon.

Unlike *Cortez*, the facts in the instant case support a finding of general criminal intent; they also support a finding of criminal negligence. Defendant was, as in all the other injuries, the first to know A.R. was injured. It was immediately apparent to every other adult that something was wrong with A.R. Doctor Collins testified as to

18

the pain A.R. suffered because of the fracture to her arm and leg bones, and that A.R. refused to move her arm or her leg because of the pain. Accordingly, we find this alleged error is without merit.

In sum, we find the circumstantial evidence, together with the direct evidence of the injuries and the time periods over which the injuries occurred, evaluated in the light most favorable to the prosecution, established Defendant's guilt beyond a reasonable doubt. Defendant's hypothesis that the child injured herself in each case was not sufficiently strong such that a reasonable juror could not have found proof of guilt beyond a reasonable doubt. Moreover, the evidence was sufficient for the jury to find that the Defendant intentionally or negligently withheld necessary medical attention, thus unjustifiably prolonging A.R.'s pain and suffering. These assignments are without merit.

## ASSIGNMENT OF ERROR NUMBER 3:

For his third assignment of error, Defendant asserts that the statements made by the victim to Doctor Ann Springer regarding who caused her injuries are inadmissible under the circumstances of this case. Defendant argues that the statements are hearsay statements and as such are expressly prohibited by La.Code Evid. art. 705(B) which provides that "[i]n a criminal case, every expert witness must state the facts upon which his opinion is based, provided, however, that with respect to evidence which would otherwise be inadmissible such basis shall only be elicited on cross-examination."

Defendant asserts that without the inculpatory statements made by A.R. to Doctor Springer, there was no direct evidence as to who caused the injuries alleged in counts two and three. The Defendant asserts:

> A defendant may only be convicted solely upon circumstantial evidence where that evidence excludes every reasonable hypothesis of innocence. La.R.S. 15:438. In incorporating the circumstantial evidence rule with the Jackson standard of sufficiency, a court must determine whether, viewing the *admissible* evidence in the light most favorable to the prosecution, a reasonable trier of fact could have concluded beyond a reasonable doubt that every reasonable hypothesis of innocence had been excluded. State v. Quatrevingt, 93-1644 (La. 2/28/96), 670 So.2d 197; State v. Mitchell, 96-207 (La.App. 3 Cir. 10/9/96); 684 So.2d 6; State v. Morris, 414 So.2d 320 (La. 1982). Absent the inadmissible hearsay statements of [A.R.], a rational trier of fact could not reasonably conclude that every reasonable hypothesis of innocence had been excluded. (Emphasis in original).

Louisiana Code of Evidence Article 801(C) defines hearsay as "a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted." The Defendant asserts that the trial court erroneously admitted the hearsay statements on the basis of an exception provided by La. Code Evid. art. 803, which, in pertinent part, provides:

20

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

. . . .

(4) Statements made for purposes of medical treatment and medical diagnosis in connection with treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to treatment or diagnosis in connection with treatment.

The Defendant argues that "[t]he hearsay statement[s] of [A.R.] to Dr. Ann Springer do not meet the requirements of this exception," in that Doctor Springer was not A.R.'s treating physician, but instead was retained by the Office of Community Service to do a forensic evaluation as to whether A.R. was a victim of child abuse.

Doctor Springer testified that during examination of the victim, conducted seven days after the victim's surgery on her shoulder, she asked A.R. what happened and A.R. told her that her right arm was lifted and pulled backward and her leg had been twisted, twice, by her stepfather. The trial court admitted the statements over the objection of Defendant on the ground that the statements were made for the purpose of medical treatment and medical diagnosis in connection with treatment.

Defendant relies heavily on *State v. Lawrence,* 98-348 (La.App. 4 Cir. 12/1/99), 752 So.2d 934, *writ denied,* 00-3 (La. 6/16/00), 764 So.2d 962, and *State v. Coleman,* 95-1890 (La.App. 4 Cir. 5/1/96), 673 So.2d 1283, *writ denied*, 97-42 (La. 10/31/97), 703 So.2d 11, to support his argument that Doctor Springer's recitation of A.R.'s statements was inadmissible.

The same expert witness, Doctor Katheryne A. Coffman, testified in both *Lawrence* and *Coleman* and the facts surrounding the statements made by the victims to Doctor Coffman were essentially identical in both cases. In both cases, the fourth circuit found the statements made by the victims to Dr. Coffman were inadmissible as

hearsay and that La.Code Evid. art. 803(4) did not provide an exception to the hearsay rule.

In *Lawrence*, the defendant was convicted of forcible rape of his twelve-year-old stepdaughter. Doctor Coffman, an expert in pediatrics and child sexual abuse, testified regarding statements made by the victim to her, which did not name the defendant as her assailant, but described the sexual acts to which she was subjected.

The victim in *Lawrence*, was initially seen by her family doctor, Doctor Janet Barnes, the day following the victim's revelation that she had been raped. Doctor Barnes examined her and treated her. Two weeks later, she was seen by Doctor Coffman by arrangement of the investigating detective (in *Coleman*, it was not until eighteen months later Doctor Coffman saw the victim). At trial, both doctors testified. Each told the jury what the victim revealed to them regarding the rape. On appeal, Lawrence argued that each doctor's testimony was erroneously admitted which contributed to the guilty verdict rendered in the case. He argued that "because neither doctor testified that any medical treatment was prescribed as a result of their interviews and exams, the hearsay exception of Article 803(4), under which they were offered, did not apply." *Id*. at 938.

In *Lawrence*, the fourth circuit found that the statements by Dr. Coffman were hearsay and not subject to the exception provided by La.Code Evid. art. 803(4). In contrast, the fourth circuit found that the statements submitted by the family doctor, Doctor Barnes, were admissible. She saw the victim the following day, examined the victim for injury and for sexually transmitted disease; additionally, the doctor referred the victim to a therapist for psychological counseling. The fourth circuit concluded that "[t]herefore, D.M's statements made to Dr. Barnes regarding the assaults by Mr.

Lawrence were made for purposes of medical treatment and were thus properly admitted under the hearsay exception of Article 803(4)." *Id.* at 941.

In the instant case, out of the presence of the jury, Doctor Springer, a pediatrician and an expert on child abuse medicine, told the trial court that she was contacted by the Natchitoches Parish Office of Community Services and asked to provide a medical evaluation and render an expert opinion. She testified that her examination consisted of the "usual history, physical exam, assessment of other evidence such as laboratory values or x-rays." She stated that she had found injuries that had not been previously found by Doctor Collins, but that the injuries did not require treatment. However, had the injuries needed treatment, she would have provided the treatment. She stated she asked A.R. what happened, for the purpose of further examination and treatment. She said it was important to know whether the injuries she saw resulted "from some identifiable external cause or is it something intrinsic to the child's medical history and background." The doctor further stated that as a pediatrician, it is her "job to make an examination and direct the course of further treatment as needed for the child's health and well-being. Anything else I do is secondary of important to that." She stated that child abuse is a medical condition which required treatment and had A.R. required additional treatment, she would have been available to provide the treatment.

On cross-examination, Doctor Springer testified that the exam lasted thirty minutes and that she never saw A.R. after the initial examination. She also stated that at the time of the examination she had not received any of the previous X-rays, or lab reports or doctor reports regarding A.R.'s condition and treatments. She stated that except for the surgeon's report, she had not received anything else up to the time of trial. Finally, on cross-examination, Doctor Springer agreed that while the mechanism

of injury was important to her diagnosis and treatment, who pulled the child's arm or twisted her leg was not relevant to treatment.

In brief, Defendant argues that regardless of how Doctor Springer characterized herself, she was not the child's treating physician. Sandra Doolittle, a social worker with the Office of Community Services, testified that the reason they sent A.R. to see Doctor Springer was to obtain a forensic evaluation as to whether A.R. was a victim of child abuse. While Doctor Springer claimed that as part of her evaluation of possibly abused children she would compile the medical information to make sure nothing was missing, she never made any effort "whatsoever to obtain the child's medical history and background in order to evaluate it as a cause of her injuries." Defendant asserts that "[A.R.] [sic] alleged statements to Dr. Springer on August 15, 2001, were not made for the purpose of diagnosis and treatment, they did not fall within a firmly rooted exception to the hearsay rule, and they lacked the reliability that is the linchpin of the hearsay exception." A.R. did not testify at trial.

In *State v. Ste. Marie*, 97-168, pp. 8-9 (La.App. 3 Cir. 4/18/01), 801 So.2d 424, 431, this court noted the 1999 Author's Notes regarding Article 803(4) exception to the hearsay rule:

> Without considering whether a statement by a child molestation victim to a therapist-certified social worker might qualify as a statement for "purposes of medical treatment and medical diagnosis in connection with treatment," the court in *State v. Tucker,* 619 So.2d 1072 (La.App. 1 Cir. 1993), held the admission of such testimony was inadmissible hearsay and was reversible error. The authors agree with the result reached. The statements for purposes of "medical treatment and medical diagnosis in connection with treatment" should be given a narrow rather than expansive interpretation, and a statement to a therapist social worker not working under the direction of a physician should not be considered as fitting within this exception."

In the present case, the statements made by A.R. to Doctor Springer do not qualify as statements necessary for the purpose of medical treatment and diagnosis in

24

connection with any treatment. Doctor Springer admitted that she was retained by the Office of Community Services to evaluate A.R. and to determine whether the injuries were a result of child abuse. Doctor Springer admitted that she did not treat the injuries A.R. presented. She also admitted that who caused the injuries was not pertinent to any treatment for the injuries.

Accordingly, the statements made by A.R. to Dr. Springer regarding who caused her injuries were inadmissible pursuant to La.Code Evid. arts. 705(B) and 803(4), and the trial court should not have permitted the statements to be repeated by Doctor Springer at trial.

However, as in *Lawrence* and *Coleman*, the statements were admitted into evidence and relayed to the jury. In *Lawrence* and *Coleman*, the admission of the hearsay statements were determined to be harmless error. This court stated in *State v. Ste. Marie*, 801 So.2d 424, 432, that "[t]he admission of inadmissible hearsay is subject to the harmless error analysis, i.e., whether the verdict was surely unattributable to the error."

Thus we must determine if the erroneous admission of the statements was harmless when viewed against the entire record and was there was sufficient independent and uncontradicted evidence to sustain the conviction.

> In determining that the erroneous admission of testimony does not require reversal of a conviction, the reviewing court must be convinced that the error was harmless beyond a reasonable doubt. *State v. Hawkins,* 96-0766, p. 5(La. 1/14/97), 688 So.2d 473, 478.

> Factors to be considered . . . include "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *State v. Wille,* 559 So.2d 1321, 1332 (La.1990)

*State v. Lawrence*, 752 So.2d at 943. *See also State v. Barnes*, 01-113 (La.App. 4 Cir. 11/7/01), 800 So.2d 1124, *writ denied,* 02-159 (La. 1/31/03), 836 So.2d 56.

As noted above, the fourth circuit in both *Lawrence* and *Coleman,* while finding the statements made by the victims were inadmissible, went on to find that the admission of each statement was harmless error. As noted by the *Coleman* court, "The use of hearsay history of the case as told to the physician by the patient may be admissible if received not to show the truth of the facts stated but only the basis for his opinion, but all hearsay history not necessary to this diagnosis is inadmissible." *Coleman*, 673 So.2d at 1286, citing *State v. Watley*, 301 So.2d 332, 334 (La.1974).

Doctor Springer admitted the information of who caused the injuries was not necessary for her to form the basis of her opinion that the injuries were of a non-accidental origin. However, she discussed in depth the most likely mechanism that caused the injuries was an intentional act. Doctor Collins, who was the physician who made the original diagnosis and performed the surgery on A.R.'s shoulder and applied the cast to A.R.'s leg, supported Doctor Springer's contention. There were no inconsistencies in the two doctors' testimonies regarding the types of injuries, the severity of the injuries, and the likely cause of the injuries. The defense had the opportunity to cross-examine Doctor Springer and Doctor Collins at length. Moreover, the State presented evidence that the injuries all occurred during the two week periods A.R. was in custody of her mother and the Defendant. In the three, two week periods A.R. lived with the Defendant, each time she received various injuries, which were always discovered by the Defendant. Finally, K.R. testified at trial that after A.R. was taken from the Defendant's home, she told K.R. that the Defendant caused her injuries, thus corroborating the inadmissible statements.

26

Considering the foregoing, we find the erroneously admitted hearsay statements A.R. made to Doctor Springer as to who caused her injuries was harmless error. We find that even without the hearsay statements, there was sufficient independent, direct and circumstantial evidence to find the Defendant guilty of the crimes beyond a reasonable doubt. Therefore, we conclude the guilty verdicts are attributable to evidence other than the hearsay testimony of Doctor Springer. Accordingly, this assignment does not support reversal of the Defendant's conviction.

**ASSIGNMENT OF ERROR NUMBER 6:**

Defendant argues that his sentences, totaling eighteen years at hard labor, are excessive because the trial court imposed the sentences to be served consecutively. Defendant does not challenge any of the sentences separately. Defendant argues that the sentences imposed on count two, three and four should have been imposed concurrently because the offenses constituted part of a common scheme or plan, and because he was a first-time felony offender.

Defendant was found guilty of four counts of cruelty to juveniles, violations of La.R.S. 14:93, which provides for a term of imprisonment of not more than ten years, with or without hard labor. Defendant was sentenced to two years at hard labor on each of counts one and four and seven years at hard labor on each of counts two and three, all sentences to be served consecutively, thus totaling eighteen years at hard labor.

Louisiana Code of Criminal Procedure Article 883 (emphasis ours) provides, in pertinent part, that "[i]f the defendant is convicted of two or more offenses based on the same act or transaction, or constituting parts of a common scheme or plan, the terms of imprisonment shall be served concurrently *unless the court expressly directs that some or all be served consecutively*."

27

"[I]n cases involving offenders without prior felony record, concurrent rather than consecutive sentences should be imposed, particularly where the convictions arise out of the same course of conduct. *State v. Jacobs*, 383 So.2d 342 (La.1980); *State v. Cox*, 369 So.2d 118 (La.1979)." *State v. Brown*, 627 So.2d 192, 199-200 (La.App. 3 Cir. 1993), *writ denied*, 93-3101 (La. 3/18/94), 634 So.2d 850.

Imposition of consecutive sentences requires particular justification. *State v. Dunbar*, 94-1492 (La.App. 3 Cir. 5/31/95), 657 So.2d 429. "[T]he trial court must articulate particular justification for such a sentence beyond a mere articulation of the standard sentencing guidelines set forth in La.C.Cr.P. art. 894.1." *State v. Dempsey*, 02-1867, p. 5 (La.App. 4 Cir. 4/2/03), 844 So.2d 1037, 1040.

> Among the factors to be considered are the defendant's criminal history, *State v. Ortego*, [382 So.2d 921, *cert. denied*, 449 U.S. 848, 101 S.Ct. 135, (1980)]; *State v. Jacobs*, 493 So.2d 766 (La.App. 2d Cir.1986); the gravity or dangerousness of the offense, *State v. Adams*, 493 So.2d 835 (La.App. 2d Cir.1986), *writ denied*, 496 So.2d 355 (La.1986); the viciousness of the crimes, *State v. Clark*, 499 So.2d 332 (La.App. 4th Cir.1986); the harm done to the victims, *State v. Lewis*, 430 So.2d 1286 (La.App. 1st Cir.1983), *writ denied*, 435 So.2d 433 (La.1983); whether the defendant constitutes an unusual risk of danger to the public, *State v. Jett*, 419 So.2d 844 (La.1982); the defendant's apparent disregard for the property of others, *State v. Parker*, 503 So.2d 643 (La.App. 4th Cir.1987); the potential for the defendant's rehabilitation, *State v. Sherer*, 437 So.2d 276 (La.1983); *State v. Lighten*, 516 So.2d 1266(La.App. 2d Cir.1987); and whether the defendant has received a benefit from a plea bargain, *State v. Jett*, *supra*; *State v. Adams*, *supra*.

*State v. Coleman*, 32,906, p. 42 (La.App. 2 Cir. 4/5/00), 756 So.2d 1218, 1247-48, *writ denied*, 00-1572 (La. 3/23/01), 787 So.2d 1010.

At the sentencing hearing, the trial court stated for the record:

> The presentence report reveals that Mr. Merritt will turn thirty-six (36) on May 22 of this year. He has been married three (3) times, with two (2) children from the first marriage, one (1) from the second, and none from the third.
>
> . . . .
>
> Mr. Merritt's criminal record indicates a hunting violation in 1995, a simple battery conviction in 2000, a plea of guilty to simple battery on

April 11, 2001, a simple battery charge dated July 28, 2000...which is pending, and an August 15, 2002, forgery and theft charge, which is pending...all in Natchitoches Parish. He has a June 30, 2002, second degree battery charge pending in Sabine Parish. The Court does not consider the hunting violation, or the pending charges in sentencing today. However, it is clear that the defendant has a criminal history of crimes against the person that extends beyond his stepdaughter. The May 2000 simple battery conviction was before this Judge. Mr. Merritt was found guilty of beating his natural son, Zachary, with a coat hanger. The April 2001 simple battery plea by him involved him battering his girlfriend. By a judgment of the 11th Judicial District Court, signed November 19, 2002, Mr. Merritt's parental rights to the two (2) children of his first marriage were terminated, apparently for failure to pay child support for a period in excess of four (4) years, and for abuse and neglect of the children. The Court has reviewed the sentencing guidelines set forth in Code of Criminal Procedure Article 894.1, and has taken them in to consideration in determining the appropriate sentence here. The Court has reviewed Article 883 of the Code of Criminal Procedure concerning sentencing when a defendant is convicted of two (2) or more offenses. Where they are based on the same scheme or act, or constitute part of a common scheme or plan, the terms of imprisonment shall be concurrent, unless the Court expressly states otherwise. The Court has considered the guidance provided by the Louisiana Supreme Court in *State v. Thomas*, for the benefit of counsel, 719 So.2d 49, where it said, "although Louisiana law favors concurrent sentences for crimes committed as part of a single transaction, a trial judge retains discretion to impose consecutive penalties on the basis of other factors, including the offenders past criminality, violence in the charged crimes, or the risk he or she poses to the general safety of the community."

The trial court went on to discuss certain mitigating factors presented to the court, and the Article 894.1 sentencing guidelines. As mitigating factors, the trial court noted that Defendant does not have a prior felony record, that he lost his father, that his mother is ill, that he has health problems, and that he has a good employment record. The trial court then stated:

The Court placed particular weight on the following sentencing guidelines found in Paragraph B of Article 894.1. [§] 2) He knew that the victim was particularly vulnerable or incapable of resistance due to her age. Number 12, he has been involved in other similar offenses to his own son, and to his girlfriend. [§] 22) His conduct caused serious harm to his stepdaughter. [§] 25) There were no grounds to excuse or justify his conduct. [§] 29) The Court is of the opinion that his conduct is likely to reoccur. [§] 30) I do not believe he will respond affirmatively to

probation because he has twice before been placed on probation for violent offenses, including being sent to anger management to no avail.

    . . . .

Significantly, he does not express remorse for committing the crimes he was found guilty of [sic]. He only needed to protect her from himself. Mr. Merritt, I am imposing consecutive sentences because, first of all, some of your offenses are not part of a common scheme of plan, and are not part of the same act or transaction. Furthermore, because of your prior history of violence to persons close to you, even though represented by misdemeanor convictions, the terrible injuries to a two (2) year old child here, and because the Court feels that you pose a risk to the general safety of the community insofar as those you seem to enter in to relationships with are concerned, consecutive and not concurrent sentences are warranted.

In the case cited above by the trial court, *State v. Thomas*, 98-1144 (La. 10/9/98), 719 So.2d 49, the defendant, a first-time felony offender, was sentenced to consecutive terms of imprisonment on three convictions, one of which was armed robbery. The remaining two convictions were offenses which occurred during and after the armed robbery. The supreme court affirmed the trial court's imposition of consecutive sentences, despite the fact the offenses were committed as a part of a common scheme or plan. The supreme court noted:

Although Louisiana law favors concurrent sentences for crimes committed as part of a single transaction (citation omitted), a trial judge retains discretion to impose consecutive penalties on the basis of other factors, including the offender's past criminality, violence in the charged crimes, or the risk he or she poses to the general safety of the community.

*Id.* at 49. The supreme court went on to state that "[e]ven granting the consecutive nature of the penalties imposed on all three counts, the defendant's total sentence remains within the 35 to 50 year range this Court has found acceptable for first offenders convicted of armed robbery." *Id.* at 50.

In *State v. Hilton*, 99-1239 (La.App. 1 Cir. 3/31/00), 764 So.2d 1027, *writ denied*, 00-958 (La. 4/9/01), 786 So.2d 113, the defendant received maximum

30

sentences for four convictions, which included indecent behavior with juveniles, molestation of a juvenile, and cruelty to juveniles. Two of the sentences were ordered to be served concurrently, but consecutively with the remaining two concurrent sentences for a total term of imprisonment of seventeen and one half years. Hilton alleged the sentences were excessive in light of the fact she was an abused person herself and that she was a first time felony offender. The first circuit noted:

> A sentence is excessive when it is grossly out of proportion to the severity of the offense or nothing more than the needless and purposeless imposition of pain and suffering. To determine whether a penalty is grossly disproportionate to the crime, the court considers the punishment and the crime in light of the harm to society and whether the penalty is so disproportionate as to shock our sense of justice. A trial court is given wide discretion in imposition of sentences within statutory limits, and the sentence imposed by it should not be set aside as excessive in the absence of manifest abuse of discretion.

*Id.* at 1037. *See also State v. Walker*, 00-3200 (La. 10/12/01), 799 So.2d 461.

In *Hilton*, the trial court noted for the record the severity of the injuries she inflicted on the children as "most atrocious acts I've ever seen." The trial court noted that the children were only four or five years of age. The first circuit noted: "It is obvious that the judge found that defendant was the worst kind of offender and that the offenses were the most serious." *Hilton*, 764 So.2d at 1038. The first circuit affirmed the trial court's imposition of the maximum sentences and the consecutive application of the sentences.

> While we acknowledge defendant's status as a first felony offender, we believe that the reasons given by the trial court support the sentences. Considering the circumstances of the instant offenses, particularly the reprehensible nature of the crimes and the permanent effect that the offenses will have on the children, we believe that the defendant is one of the most egregious and blameworthy offenders.

*Id.*

In the present case, the offenses took place over a period of three months. According to the amended bill of information, two of the offenses, Counts three and four, took place on the same day, August 6, 2001. However, we find that those offenses were neither based on the same act or transaction, nor constituted part of a common scheme or plan. Rather, count four was committed by the Defendant in an attempt to cover up the Defendant's earlier abuse of the victim. We find it was not part of a grand scheme, but a last minute attempt to avoid detection.

Accordingly, we find that the reasons given by the trial court support its imposition of consecutive sentences, particularly in light of the severity of the injuries suffered by the victim, and considering Defendant's misdemeanor criminal history of violence against other persons, including children. Furthermore, much discretion should be afforded the trial court's determination that consecutive sentences were appropriate in this case. *See Walker*, 799 So.2d at 461. This assignment lacks merit.

**DISPOSITION:**

Accordingly, Defendant's convictions and sentences are affirmed.

**AFFIRMED.**

**STATE OF LOUISIANA**

**VERSUS**

**DILLON JAMES MERRITT**

THIBODEAUX, C.J., dissenting in part.

The majority errs in affirming the Defendant's convictions on Counts 2 and 4.

The Defendant was convicted of causing A.R. unjustifiable pain and suffering by refusing to allow A.R. to receive necessary treatment. The tenuous evidence in this record simply does nor support a conviction. K.R., the victim's mother, did not think the child needed emergency treatment. While the majority is correct that emergency treatment is not an element of the offense, what is significant is that the mother felt A.R.'s condition did not warrant medical attention. Deputy Polk thought that A.R. was uninjured; the deputy did not observe any visible signs of injuries or trauma. Ms. Matthews called the Department of Social Services only *after* Deputy Polk advised her to stay away from the Merritt residence. One is left to wonder why Ms. Matthews did not call the Department of Social Services before if she felt that A.R. was in distress and in need of medical care. The likely inference, I think, is clear. She was unhappy with being told to stay away from the Merritt residence. She, therefore, initiated the call because of her discontent with being excluded, not because of a genuine concern for the child's welfare. The reasonable

thing to do, if she felt A.R. was in distress and pain, would have been to call for assistance immediately upon leaving the Merritt residence.

While subsequent actions did indeed disclose the need for medical attention, we cannot view this discovery in a vacuum. While hindsight is helpful, we cannot convict on what was later discovered under these circumstances. As *State v. Cortez*, 96-859 (La.App. 3 Cir. 12/18/96), 687 So.2d 515, 522, observed, "a bad judgment call falls woefully short of equaling intentional mistreatment or criminal negligence and, without more, does not give rise to a charge under this statute [La.R.S. 14:93]" because

> [i]n order to prove criminally negligent mistreatment, the state must show that [the defendant's] conduct was so far below that expected of a reasonably careful person that it must be considered a gross deviation. The state attempted to prove this through circumstantial evidence, which requires the state to exclude all reasonable hypotheses of innocence on the part of [the defendant].

*Id*. at 520.

The circumstantial evidence in this case does not rise to the level of showing a "gross deviation" from a reasonably careful person's conduct. The majority was wrong in affirming this conviction.

With respect to Count 2, without the indisputably inadmissible hearsay testimony, was there, as the majority observes, "sufficient, independent and uncontradicted evidence to sustain a conviction" beyond a reasonable doubt? Was Dr. Springer's inadmissible testimony harmless such that a conviction on Count 2 which charged that the Defendant inflicted A.R. unjustifiable pain and suffering by causing a spiral fracture of the leg supported by sufficient independent evidence? No one saw the Defendant injure A.R.'s leg at any time. A.R.'s sister was the only person in the room with her on June 11, 2001, the date on which they were jumping around in bed when A.R.'s sister claims she was hurt. Dr. Collins testified that A.R. was a product

2

of neglect and abuse which resulted in the leg injury. Dr. Collins did not, indeed he could not, say from whom the injury occurred. Nor did the State rule out the possibility of an accidental injury with the evidence presented. Once the testimony of Dr. Springer is extricated from consideration, we are left with evidence that is woefully insufficient to uphold a conviction. I cannot say that the guilty verdict on Count 4 in this trial was surely unattributable to the error. *See State v. Johnson*, 94-1379 (La. 11/27/95), 664 So.2d 94; *Sullivan v. Louisiana*, 508 U.S. 275, 113 S.Ct. 2078; La.Code Crim.P. art. 921.

I would reverse the convictions on Counts 2 and 4 and remand for the imposition of concurrent sentences on Counts 1 and 3. *See State v. Ste. Marie*, 97-168 (La.App. 3 Cir. 4/18/01), 801 So.2d 424, *writ denied*, 02-1117 (La. 12/19/02), 835 So.2d 1288.

For the foregoing reasons, I respectfully dissent.