STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

06-595

STATE OF LOUISIANA

VERSUS

TRENT MILLER

**********

APPEAL FROM THE
ELEVENTH JUDICIAL DISTRICT COURT
PARISH OF SABINE, NO. 59197
HONORABLE CHARLES BLAYLOCK ADAMS, DISTRICT JUDGE

**********

OSWALD A. DECUIR
JUDGE

**********

Court composed of Oswald A. Decuir, Marc T. Amy, and Billy Howard Ezell, Judges.

AFFIRMED.

Anna L. Garcie
Assistant District Attorney
P. O. Box 1557
Many, LA 71449
(318) 256-6246
Counsel for Appellee:
        State of Louisiana

C.R. Whitehead, Jr.
Whitehead Law Offices
P. O. Box 697
Natchitoches, LA 71458-0697
(318) 352-6481
Counsel for Defendant/Appellant:
        Trent Miller

**DECUIR, Judge.**

Defendant, Trent Miller, was convicted of second degree murder while engaged in the perpetration of cruelty to a juvenile, a violation of La.R.S. 14:30.1(A)(2)(b) and sentenced to life imprisonment. Defendant now appeals to this court assigning three errors.

## FACTS

The events pertinent to the current appeal occurred from Friday, February 27, 2004, through February 29, 2004. On that Friday, the four-year-old victim, Melenia Martinez, stayed at the home of her maternal great-grandparents. Her mother Whitney Martinez, her six-year-old brother, Tristine, and Defendant were also there, because her great-grandmother and her grandmother had been in an automobile wreck. Throughout that Friday and Saturday, the victim appeared to behave and function normally.

At about 2:00 p.m. on Sunday, February 29, 2004, the victim, her mother, her brother, and Defendant left the grandparents' residence to go home. When they arrived at about 2:30 p.m., Melenia's mother entered the residence first, by herself; the victim exited the car and walked into the building next. According to a statement Defendant gave to police, he and Tristine unloaded the car, then entered the residence. Upon entering, he heard the victim whimpering in her room; when he checked on her, she was unsuccessfully trying to hang her coat on a hanger. He told her that he would be back to help her, then checked on her sick mother, in the bathroom. He returned to Melenia's room, and found her sitting in a chair. When he began demonstrating how to hang the coat, she got up and stood near him. According to Defendant's statement, her eyes suddenly rolled up in her head and she fell into his arms.

Defendant and the victim's mother put her in the car and took her to Sabine Medical Center. Because she manifested signs of brain injury, the Sabine hospital staff transferred her to the LSU medical facilities in Shreveport. Doctors there concluded she had suffered a massive brain injury; she had a large subdural hematoma and retinal hemorrhages in her eyes. Initial testing indicated she had Chlamydia in her rectum, but trial testimony indicated the testing was unreliable. The victim died on March 2, 2004.

At trial, doctors testified that the victim's brain and eye injuries were signs of "shaken baby syndrome."

## SUFFICIENCY OF EVIDENCE

Defendant first challenges the sufficiency of the evidence adduced against him at trial. At the outset, the Defendant observes that there were no eyewitnesses to the offense, therefore the State's case relied upon circumstantial evidence. He argues that the controlling law is in *State v. Merritt*, 03-946 (La.App. 3 Cir. 3/17/04), 875 So.2d 80, *writ dismissed*, 04-2827 (La. 3/18/05), 896 So.2d 987. We note that *Merritt* cited *State v. Porter*, 99-1722, pp. 14-16 (La.App. 3 Cir. 5/3/00), 761 So.2d 115, 123-124, in which this court explained:

> We find no reported cases discussing second degree murder convictions pursuant to La.R.S. 14:30.1(A)(2)(b). In order to convict a defendant of second degree murder pursuant to this section, the State must prove that the death of three-year-old Morgan Bonton occurred while the Defendant was engaged in the perpetration of cruelty to juveniles.
>
> Cruelty to juveniles is set forth in La.R.S. 14:93(A), and it provides that cruelty to juveniles is the intentional or criminally negligent mistreatment or neglect of a child whereby unjustifiable pain or suffering is caused to the child. The term "intentional" within the meaning of this statute, requires general criminal intent to cause a child unjustifiable pain and suffering. *State v. Cortez*, 96-859 (La.App. 3 Cir. 12/18/96); 687 So.2d 515, 519, *citing State v. Morrison*, 582 So.2d 295 (La.App. 1 Cir. 1991). Mistreatment as used in this statute means

2

"abuse." *State v. Cortez*, 687 So.2d at 519, *citing State v. Comeaux*, 319 So.2d 897, 899 (La.1975).

Thus, in order for the State to prove that the Defendant was guilty of the second degree murder of Morgan Bonton it had to establish either (1) that the Defendant intentionally mistreated or neglected the child, or (2) that the Defendant was criminally negligent in his mistreatment or neglect of the child. To be criminally negligent in his mistreatment or neglect of the child, the Defendant must have such disregard of the interest of the child that his conduct amounted to a gross deviation below the standard of care expected to be maintained by a reasonably careful person under like circumstances. See La.R.S. 14:12.

Circumstantial evidence consists of the proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. *State v. Guillory*, 670 So.2d at 304, *citing State v. Donahue*, 572 So.2d 255 (La.App. 1 Cir. 1990). The circumstantial evidence rule does not require the State to exclude every possible theory of innocence, but only the reasonable hypotheses of innocence. *State v. Lilly*, 468 So.2d 1154 (La.1985). In circumstantial evidence cases, this court does not determine whether another possible hypothesis suggested by a defendant could afford an exculpatory explanation of the events. Rather, this court, evaluating the evidence in the light most favorable to the prosecution, determines whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt under *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). *State v. Davis*, 92-1623 (La. 5/23/94); 637 So.2d 1012, *certiorari denied*, 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359 (1994).

Defendant claims the State did not prove beyond a reasonable doubt that he committed cruelty to a juvenile. More specifically, he argues there was no evidence the victim "suffered or endured unjustified pain or suffering," and no evidence that he abused the victim or her brother. These statements are inaccurate.

The medical evidence adduced at trial clearly demonstrated that the victim died due to non-accidental trauma to her brain. Dr. Elizabeth Miller, the forensic pathologist who performed the autopsy, testified to this effect, as did LSU emergency room physician, Dr. Steven Conrad. Dr. Aftab Karim, the neurosurgeon who operated on the victim, testified similarly, although his conclusion was partially based on his not receiving any history of an accident in connection with the child's injuries.

3

Dr. Alan Richards, a pediatric ophthalmologist, who examined the victim, testified the victim's injuries were symptomatic of "shaken baby syndrome." He explained the victim's symptoms were consistent with "a non-accidental trauma caused by child abuse, most likely caused by violent shaking by a caretaker." Dr. Scott Benton, an expert on pediatric forensics, testified to the same effect. Specifically, he testified the cause of death was damage to the brain itself. Dr. Ken Ward, a pediatric radiologist, testified that the victim's injuries were equivalent to those that would result from a high-velocity car wreck, or a three-story fall onto a sidewalk.

At trial, Defendant did not appear to challenge the conclusion that the victim died due to non-accidental trauma. The gist of his defense theory, as seen in his opening and closing statements, was that the State did not prove beyond a reasonable doubt that he inflicted said injuries. He repeats that argument in his brief to this court, and also argues the State failed to prove the elements of the underlying offense of cruelty to a juvenile.

In his review of the medical evidence, Defendant argues that none of the testifying physicians were able to establish a "timeline" regarding when the victim's injuries occurred. However, he acknowledges that Dr. Karim testified the injuries likely occurred within the seventy-two hours preceding the victim's admission to the hospital. He further notes that Dr. Ward testified the injuries occurred between six and seventy-two hours before the CT scans were taken. Dr. Ward testified the CT scans were taken at approximately 6:49 p.m. on February 29, 2004.

However, as the State points out in its brief, Dr. Karim testified the effects of the victim's injuries were of a type that would have manifested immediately. Dr. Benton testified similarly, noting that activities such as walking from the car to the house and making a conscious attempt to hang up her coat (victim's activities shortly

4

before her collapse, as indicated by Defendant's statements to police, and by her mother's testimony) would not have been possible after the victim sustained the degree of brain damage demonstrated by the medical evidence. Dr. Miller agreed that such ability to perform normal, day-to-day functions would be unlikely after such trauma.

Whitney Martinez, the victim's mother, testified that the young girl was fine, performing normal activities on Friday, February 27, 2004. She also testified that the victim performed normal activities, such as playing with blocks, eating, and playing "school," on Saturday. On Sunday morning, the victim and her brother woke up, ate breakfast, and watched cartoons. Martinez and Defendant, who had both made early morning visits to the hospital, napped from late morning until about 1:30 p.m. She testified her grandparents were awake at this time. When the sound of the telephone woke her up, the children were still playing and watching television.

The telephone call was from Defendant's supervisor, telling him to come in to work. Therefore, Martinez, Defendant, the victim, and her brother got dressed; the children put on their coats and shoes, and all four of them drove back to their trailer.

The trip to their residence was approximately twenty minutes, and the victim fell asleep on the way. Martinez woke the child up when they arrived at the residence. Defendant let the victim out of the car, and she walked into the house ahead of her mother. The little girl headed toward the children's bedroom, and Martinez headed for the bathroom, due to her illness. Martinez began to bathe; then Defendant came in looking for a washcloth. He left, then came back and told her that something was wrong, that she needed to come see the victim. When Martinez entered the living room, her daughter was lying on the couch. The little girl's breathing was labored, and Defendant advised Martinez that she had defecated on

5

herself. Defendant and Martinez took the victim to Sabine Medical Center and that facility transferred her to LSU Health Sciences Center in Shreveport. Medical and surgical efforts to save the victim failed, and she died at the latter facility on March 2, 2004.

The trial court viewed videotapes of two separate statements Defendant gave to police. He told police that on Sunday, when they returned to their residence from Martinez's grandparents' home, the victim walked into the trailer. When Defendant entered, he heard a whining sound, and found the victim trying to hang up her own jacket. He told her to wait, and he went to check on Martinez in the bathroom. Also, he told the victim's brother to start separating the clothes they had brought back with them. When he returned to the children's bedroom, the victim was sitting in a chair. He started to hang up her jacket, and she came and stood beside him. Suddenly, according to Defendant's statement, her eyes rolled up in her head, she collapsed, and he caught her in his arms. Defendant told police he was around the victim a lot from Wednesday through Sunday on the week of the offense, and that he did not recall seeing indications that she was sick. However, he stated she slept unusually late on Saturday night and into Sunday morning.

The victim's grandmother, Nawana Remedies, also testified that she observed the victim on the Friday before the offense, and that the child seemed to be playing and otherwise behaving normally. She also saw the victim on Saturday, for "two to three hours," and the child appeared to be fine; she ate, played, talked, and watched television. She saw the victim only briefly on Sunday, and the child was asleep.

The testimonies of Remedies and Martinez, and Defendant's own statements, combined with the medical testimony, overwhelmingly narrow the window of time during which the victim's injuries could have occurred. It is clear from the evidence

6

recounted above that the little girl's injuries had to have been inflicted immediately before she became symptomatic. The testimony of Martinez and Defendant's own statement show that he is the only person who was in a position to have inflicted those injuries. Martinez was in the bathroom at the relevant time, and was apparently quite ill. The record is not clear regarding the whereabouts and activities of the victim's older brother, Tristine, after the family entered the house. However, since Defendant admitted in his statement that the victim was still able to get up and walk that last time he entered her room, any theory that the boy could have inflicted the injuries is negated. Further, Defendant told police that shortly before re-entering the children's bedroom to help the victim with her jacket, he saw Tristine and instructed the boy to separate the laundry. The Defendant appears to concede that Tristine knows nothing about the crime.

Thus, we find the trial evidence was sufficient to exclude any reasonable hypothesis that someone other than Defendant inflicted the fatal injuries.

In Defendant's other argument under this assignment, he notes he was charged and convicted of second degree murder, because the killing occurred when he was committing cruelty to a juvenile, even though he lacked intent to kill or inflict bodily harm. Further, he observes the statutory definition of cruelty to juveniles, set forth in La.R.S. 14:93(A), which states in pertinent part, "A. Cruelty to juveniles is: (1) The intentional or criminally negligent mistreatment or neglect by anyone seventeen years of age or older of any child under the age of seventeen whereby unjustifiable pain or suffering is caused to said child. Lack of knowledge of the child's age shall not be a defense. . . ."

Defendant argues there was no evidence "that the victim . . . suffered or endured unjustified pain or suffering." This particular portion of the argument fails,

7

because it is clear the victim died as a result of "shaken baby syndrome." Thus, the young girl was shaken to death.

Accordingly, the victim's injuries are indicative of unjustified pain and suffering. First of all, it is logical to conclude that a child shaken in this manner would in fact experience unjustified pain and fear, even if only for an instant before lapsing into unconsciousness. Second, a defendant should not be able to put himself outside the prohibitions and punishment mandated by La.R.S. 14:93, simply by knocking out a child victim with the first assault. This cannot have been the legislative intent.

Defendant also argues the facts do not demonstrate that he had the general intent to inflict pain or suffering upon the victim, or that he was negligent in his care of the victim. Defendant cites *State v. Cortez*, 96-859 (La.App. 3 Cir. 12/18/96), 687 So.2d 515, as support for his position. In *Cortez*, this court held the evidence was insufficient to support the defendant's conviction for attempted cruelty to a juvenile. However, we find that case distinguishable from the present one, as the State's theory in *Cortez* was that the defendant had delayed treatment of injuries the victim had suffered.

As present defendant observes, part of the reason for the reversal in *Cortez* was this court's conclusion that the circumstantial evidence did not demonstrate when the injury occurred. *Id.* As already demonstrated, that difficulty does not exist in the case sub judice, because the testimony of two lay witnesses, and the Defendant's own statements to police, combined with the extensive medical testimony to establish the time-frame and manner of the injuries at issue. Further, *Cortez* is distinguishable because the present case involves the intentional infliction of injuries upon the victim,

8

while *Cortez* involved the withholding of treatment for an injury. Therefore, this portion of Defendant's argument fails.

On a similar note, Martinez testified the victim suffered apparently minor injuries while in Defendant's care:

Q. And you took them -- you took Melenia, excuse me, to see Amy Garcie on February 12th.

A. Yes, ma'am.

Q. And you didn't see any marks or bruises on her before you took her to the doctor, is that correct?

A. No, ma'am.

Q. But you did see marks on her between the 12th and the 17th?

A. Yes, ma'am.

Q. Regarding the bruise on her buttocks that was thought to be a bite mark, you didn't find that did you?

A. No, ma'am.

Q. Who found that?

A. Trent.

Q. While he was keeping them?

A. Yes, ma'am.

Q. And the fall to her wrist, who reported that to you?

A. Trent.

Q. That occurred while he was keeping her?

A. Yes, ma'am.

Martinez also testified that Defendant advised her not to take the victim to a doctor's appointment to check for abuse, because OCS would blame Martinez, and take her children. The Defendant's second statement was generally corroborative of Martinez's testimony regarding these injuries. Further, Dr. Ward testified the victim

9

had a minor arm fracture that was less than seven days old. He also stated that such injuries are very common, and that there was little he could conclude regarding the injury, other than stating it was evidence of trauma. However, Dr. Benton testified the arm injury, and other bruising on the child's body, indicated there was "probably out-of-control discipline going on."

As already discussed, the State developed a strong circumstantial case identifying the Defendant as the offender, based upon events that occurred on the last weekend of the victim's life, combined with the medical evidence.

In another argument, Defendant mentions that none of his DNA was found on the victim's shirt or coat. However, this has little bearing on the case since Defendant's statements and Martinez's testimony showed that he touched the victim, at the very least to catch and carry her unconscious body. Thus, the lack of DNA is merely inconclusive in the context of the overall case.

Also, Defendant notes that Dr. Miller, who performed the autopsy, testified there was no apparent damage to the victim's neck muscles or blood vessels; however, this was but one fact for the trial court to weigh. Dr. Miller acknowledged that such neck damage would be possible in a shaken-baby situation, but did not indicate that such damage would be inevitable, or even likely.

For the reasons discussed, this assignment lacks merit.

### ADMISSION OF EVIDENCE

In this assignment of error, Defendant argues the trial court erred by allowing into evidence the victim's medical records from the LSU facility in Shreveport. He claims, as he did below, the purported certification of those records did not comply with the requirements set forth in La.R.S. 13:3715. The statute states:

> Whenever a certified copy of a chart or record of any state operated health care facility is offered in evidence or when any court of

10

competent jurisdiction has ordered the production of any chart or record of a state operated health care facility, certified copies of such chart or record, signed by the administrator or the medical records librarian of such hospital and attested by the seal of the hospital, shall be received in evidence with the same force and effect as though the original document were produced, and it shall be a sufficient compliance with any such order of court to furnish copies so certified.

Defendant notes the records at issue were certified by a person identified as the "Director, Health Information Management Dept.," rather than a person specifically designated as a librarian. Further, he argues the statute should be strictly construed so as to exclude the records at issue. For support, he cites *State v. Wilkinson*, 00-339 pp. 18-19 (La.App. 5 Cir. 10/18/00), 772 So.2d 758,768, *writ denied*, 00-3161 (La. 10/12/01), 799 So.2d 494, which discussed a similar statute, La.R.S. 13:3714:

> In *State v. Trahan*, 332 So.2d 218, 220 (La.1976), the court explained that, because the medical records rule is an exception to the hearsay rule created by statute, it is essential that all of the formalities prescribed in the statute be followed before such records are admissible in evidence. After finding that the records which the Defendant sought to introduce were not certified by any of the authorities named in the statute, the *Trahan* court concluded the records did not qualify for introduction under the hospital records exception to the hearsay rule and that the trial court correctly sustained the State's objection to their admission. The *Trahan* court further concluded that, based on the evidence presented, no great prejudice was suffered by the defendant because of his inability to introduce the medical records in question. See also, *State v. Day*, 00-64, p. 8 (La.App. 5th Cir. 5/30/00), 762 So.2d 264, 268, wherein this court held medical records were improperly admitted at trial since the proper party did not sign or verify the records as required by LSA-R.S. 13:3714.

> The records sought to be introduced here recite that they were certified by a supervisor in Health Information Management, rather than the administrator or medical records librarian as required by the above statute. Thus, we find they were properly excluded.

In *State v. Spooner*, 368 So.2d 1086, 1088 (La.1979), the supreme court faced a similar problem:

> Trial of this matter was held May 22 through May 24, 1978. At trial defendant sought to introduce into evidence the file from the East Louisiana State Hospital which covered the period of his commitment there. He was allowed to introduce only the cover letter, which showed

11

the duration of the commitment; he was not permitted to produce the file which would contain any observations of his condition at the time of admission or the diagnosis which was made, though there is in the record of this case prior to trial a series of psychiatric evaluations showing that the defendant was a borderline mental retardate suffering from schizophrenia, paranoid type, that prior to his arrest in December of 1974 he had been hospitalized at Mandeville, and that this time of the arrest was a brief period between hospitalization at Mandeville and hospitalization at Jackson.

Defendant claims that the refusal of the court below to consider the hospital records was error, as the records would show that he was not mentally competent at the time he made the inculpatory statements introduced at the trial. Inclusion of the records in evidence might show that the State would have the burden of proving that defendant was competent to give a credible inculpatory statement.

The State argues that the exclusion of the records was proper, that the exception to the hearsay rule which is established by R.S. 13:3714 should be very narrowly interpreted, so that only the "administrator or the medical records librarian of the hospital in question" would be the ones who could certify any records so as to qualify them for admission in evidence. Because the records herein were certified by the "Superintendent" of the East Louisiana State Hospital, the State argues they are inadmissible.

That hearsay evidence may not be admitted is a fundamental rule. R.S. 15:434. However, R.S. 13:3714, as revised in 1977, establishes one of the limited exceptions to the hearsay rule. The question for our consideration is whether a "Superintendent" is an "administrator" for the purpose of this exception.

Courts of this state may take judicial notice of the state statutes. R.S. 15:422. It is noted that the legislature has enacted statutes dealing with the establishment of the various state hospitals and the duties of those charged with operating them. See generally R.S. Title 28 and R.S. 40:2001, et seq.; for more particular examples see R.S. 28:2(14) and R.S. 40:2013.3. It is clear that the person denominated "Superintendent" by the acts of the legislature is the one who is the "administrator," and we so hold. The general term "administrator" is not to be limited to one who is given that title, *but is to be read as applying to those who in fact fulfill the functions of an administrator*.

The court below erred in excluding the record which the East Louisiana State Hospital certified through its Superintendent.

(Emphasis added).

12

The *Spooner* court's conclusion that a "superintendent" and an "administrator" accord with the common understanding of those terms. Our survey of current statutes has not revealed a clear statutory correlation between the terms "librarian" and "health information manager." However, at trial Dr. Conrad, the attending physician, testified that at LSU Health Sciences Center the librarian for medical records holds the title "Director of Health Information Management." Defendant indicated he would cross-examine the doctor on this point, but did not do so.

As the *Spooner* court correlated the terms "administrator" and "superintendent" based upon a review of the statutes, we find, based upon Dr. Conrad's testimony, that a "health information manager" or "director of health information management" is a librarian, for purposes of La.R.S. 13:3715. The strict reading advocated by Defendant would place any number of legitimate, authentic medical records beyond the parameters of the statute. Under his interpretation, whenever a medical facility used a term other than "librarian" for its custodian of records, neither La.R.S. 13:3714 nor 13:3715 would apply. *Spooner* shows this would not be a proper result. *Trahan* has never been overruled, and its call for procedural caution in applying La.R.S. 13:3714 is sound. However, *Spooner* tempers *Trahan*, by demonstrating that the application of the statute is not limited to the exact job titles that appear in its language. Further, the same reasoning would apply to both La.R.S. 13:3714 and 13:3715.

For the reasons discussed, this assignment lacks merit.

## HEARSAY EVIDENCE

Defendant contends that the trial court erred by allowing the State to introduce hearsay evidence, in the form of a certificate from the Center for Disease Control. The document negated the presence of sexually-transmitted diseases in the victim's rectal area.

13

As the State points out in its brief, the Defendant appears to combine this assignment of error in the heading for his sufficiency argument. However, Defendant does not include any argument on this issue. Thus, the State argues this assignment should be considered abandoned, pursuant to Uniform Rules, Courts of Appeal, Rule 2-12.4.

Defendant states in his *Jackson* argument that he is discussing both assignments in the same argument, but he does not mention the admissibility issue. Accordingly, the State's position is correct; therefore, this assignment lacks merit.

## CONCLUSION

Defendant's conviction and sentence are affirmed.

**AFFIRMED.**