STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

**11-32**

**STATE OF LOUISIANA**

**VERSUS**

**RON STEWART MARTIN**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
THIRTIETH JUDICIAL DISTRICT COURT
PARISH OF VERNON, NO. 71609
HONORABLE JOHN C. FORD, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**JOHN D. SAUNDERS
JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of John D. Saunders, Oswald A. Decuir, and Marc T. Amy, Judges.

**AFFIRMED.**

**Hon. James David Caldwell**
**Attorney General**
**P. O. Box 94005**
**Baton Rouge, LA 70804-9005**
**(225) 326-6000**
**Counsel for Plaintiff Appellee:**
**State of Louisiana**

**G. Paul Marx**
**Attorney at Law**
**P. O. Box 82389**
**Lafayette, LA 70598-2389**
**(337) 237-2537**
**Counsel for Defendant Appellant:**
**Ron Stewart Martin**

**Terri R. Lacy**
**Assistant Attorney General**
**P. O. Box 94005**
**Baton Rouge, LA 70804-9005**
**(225) 326-6200**
**Counsel for Plaintiff Appellee:**
**State of Louisiana**

**Ron Stewart Martin**
**IN PROPER PERSON**
**A.V.C. H, D-1**
**1630 Prison Rd.**
**Cottonport, LA 71327**

**SAUNDERS, Judge.**

On January 30, 2007, the Vernon Parish Grand Jury indicted Defendant, Ron Stewart Martin, with one count of second degree murder. Prior to trial, Defendant waived his right to a jury trial and moved to proceed via bench trial. Following trial on the merits, the trial court found Defendant guilty of manslaughter, in violation of La.R.S. 14:31.

Defendant now appeals his conviction.[1] We affirm.

## FACTS:

On November 25, 2006, Gladys Martin, a ten-week old infant, sustained injuries that caused her mother, Sheila Newhouse, to transport her to Beauregard Hospital. The doctors at Beauregard Hospital examined Gladys and eventually informed the family that they needed to medi-vac her to LSU at Shreveport.

On November 28, 2006, the medical staff at the LSU Medical Center in Shreveport determined that Gladys's prognosis was fatal. At that point, Defendant was first interviewed by Vernon Parish detectives. In that interview, Defendant claimed that Gladys was in the care of Sheila when the injuries occurred. This fact was corroborated by Sheila.

After the family obtained a second opinion, life support was removed. Thereafter, an autopsy was performed on November 30, 2006, seeking the nature, extent, and possible cause of the Gladys' injury and eventual death. Based on the information obtained through the autopsy and developed during the course of the investigation, Defendant was interviewed a second time.

---

[1]Defendant has separately appealed his habitual offender sentence which we have decided this day in an unpublished opinion entitled *State of Louisiana v. Ronald S. Martin* and bearing docket number KA 10-951 (La.App. 3 Cir. __ / __ / 11).

The first portion of Defendant's second interview was consistent with the information he relayed in the first interview. Defendant maintained that Sheila had dropped Gladys while giving her a bath; however, Defendant changed his story before the end of the interview. Defendant then said that it was he who had dropped the infant. Defendant explained that he and Sheila had originally stated it had been Sheila because he was scared he would get into trouble with his being on parole.

Defendant professed that the baby slipped out of his hands during a bath because she was slippery from the soap. When she fell, her head hit the side of the bathtub. Defendant said he picked up Gladys after she fell, took her into the bedroom, and called Sheila. Defendant also stated that he had consumed a six-pack of alcoholic beverages that day. Defendant agreed that the baby's crying frustrated him, but it was not enough to make him intentionally hurt the infant.

Defendant was eventually arrested and charged with second degree murder of Gladys. At trial, several witnesses testified, including Dr. James Traylor, an expert in the field of forensic pathology. Dr. Traylor autopsied Gladys Martin in late 2006. Prior to starting his examination, Dr. Traylor had been informed that Gladys had been dropped in a bathtub. Dr. Traylor's examination revealed that Gladys' soft spot was bulging, which indicated swelling of the brain. There was a large linear skull fracture, about seven centimeters long, running backwards from behind the right ear. The fracture was initially obscured by the soft tissue hemorrhage caused by the bleeding associated with the skull fracture. After the tissue was removed, Dr. Traylor discovered the impact point just behind the right ear. It was one to one and a half centimeters in diameter, which is a little smaller than a dime. In addition, to the subdural hemorrhage, there was also a subarachnoid hemorrhage, which means there

was blood located between the brain and the membrane covering it. The brain, itself, was swollen. Therefore, the autopsy showed that the cause of death was "blunt force injury to the head resulting in a linear skull fracture with all the other associated things."

Dr. Traylor explained that, in falls, the brain is injured at the site of the impact as well as on the opposite side from the recoil caused by the impact. Though a baby's brain slides around more easily because it is not fixed within the skull like an adult's brain, there was no indication of a recoil injury in the instant case. Therefore, the evidence in Gladys' autopsy was inconsistent with a fall. Further, according to Dr. Traylor, Gladys' linear skull fracture could not have been the result of her being dropped, even from chest height.

Dr. Traylor explained that, at the time of the autopsy, he concluded that the infant's death was caused by homicide. The death certificate, prepared by the coroner after reviewing Dr. Traylor's autopsy report, reflected Dr. Traylor's findings.

On cross-examination, Dr. Traylor explained that the surfaces of a porcelain tub would not have caused injuries consistent with those discovered during the autopsy because the injuries were caused by an object that had a point. However, Dr. Traylor did state that it was possible that the injury could have been caused by the baby sling shown in the bathtub in one of the photographs taken by detectives if the point of impact was a corner where pieces of the metal frame joined.

Dr. Traylor asserted that he ran gene testing on Gladys to make sure she did not suffer from osteogenesis imperfecta, commonly known as brittle bone disease. The results were negative for that disorder, but there was still a one percent chance that she had the disorder without it showing up in the test results. Dr. Traylor

3

acknowledged that there was an ongoing debate in the medical field concerning pediatric head injuries.

On redirect examination, Dr. Traylor explained that the articles presented to him for discussion by the defense address the medical community's tendency to assume that all traumatic brain injuries in children were inflicted. The articles stress that some of those injuries could have been accidental. Diagnoses, causal determinations, and autopsy findings are all somewhat dependent on the history provided to the doctors. In testimony initially proffered but later accepted into evidence, Dr. Traylor examined the bath seat and explained that there was arguably one area on the item that could have caused the injury; however, even dropping the infant onto it from a height of five feet would not produce the force required to inflict Gladys' skull injury.

## ASSIGNMENT OF ERROR NO. 1:

Defendant claims that the verdict is based on insufficient evidence where the State did not establish the cause of death. According to Defendant, the State merely relied on its evidence to suggest that the father was not truthful about how the accidental death occurred, without providing any evidence of what might have actually happened. Defendant also suggests that the State complained that the father did not go to the hospital enough during the baby's treatment and relied on other innocuous facts as evidence that he did not love the child. None of these facts proved any conduct of Defendant which could have caused the baby's death.

Further, the defense contends that the State's expert was not credible and that the jury should have given greater weight to the evidence presented by the defense

4

showing the expert's opinion was not reliable. Defendant complains that, ultimately, he was only convicted because the State showed he was a bad father.

The State responds that credibility determinations are within the purview of the finder of fact. Thus, the trial court, as the factfinder in the instant case, found the State's witnesses to be credible after observing the witnesses, hearing the testimony, and inspecting the evidence presented at trial. The State maintains that its witnesses were credible and that the evidence was sufficient to support Defendant's manslaughter conviction. Insofar as Defendant argues that the State's expert witness was not reliable, the prosecution points out that Defendant did not challenge Dr. Traylor's expertise at trial.

Following the trial, the trial court set forth its reasons for finding Defendant guilty of manslaughter:

> All right, the Court has, of course, heard the case and after deliberating and considering the evidence and reviewing all that was presented, the Court would observe the following things, that is, when this -- the mother was apparently on an errand to -- for the father, Mr. Martin, in Oakdale and received this phone call while she was in the car with some friends and became upset because of the phone call and told them that she had to go home because something had happened. Now, that's circumstantial evidence that what had happened was injury to her child. The mother jumps out of the car when they get to where her car was parked, before it even stopped, gets in her car and flies off to Pitkin. What does this concerned mother do for a woman who is upset about her child, presumably, because of what she had been told on the phone. We don't know what that was, but based on her observations -- the observations, her demeanor, she's upset. What does she do? She goes in and makes arrangements to take her child to -- immediately to take her child to the doctor or the hospital in Beauregard Parish. But she also proceeds to concoct this story with her boyfriend, father of the child, to where she's the one who dropped the child while bathing it. I don't have much sympathy for [the] mother. Ask yourself, what would precipitate these two to concoct this kind of story? But, they get to the hospital. Mr. Martin doesn't go, I do find that unusual. Then the injuries are diagnosed as so serious that it has to be transported to Shreveport. They go to Shreveport, Mr. Martin goes with them up there, where they take the statement from him that corroborates the statement

given by the mother at the hospital two days before that she caused the injuries to the child. Then the child, of course, dies. Then we have the unrecorded statement by the Vernon Parish deputies, investigators. . . . [T]hat statement was taken before two deputies unrecorded where the defendant then says that he's the one who dropped the child on the edge of the tub, a distance of about a foot. The coroner gets the case -- not the coroner, the expert here, the forensic pathologist, the person who does the autopsy, and that's -- the autopsy reveals, of course, the fracture he described which is a severe fracture. The photographs verify that. Doctors describe the fracture, describe the mechanics of how fractures occur and what -- how it affects the brain and the dynamics of a fracture. I listened to him pretty closely and at one point during -- he described the difference between the force that the brain receives when the head is in motion and it strikes a solid object as opposed to when the head is at rest and force is applied to the head. I thought I understood him to say then that a fall couldn't have caused this injury, that it had to be some force applied to the side of the head. But then he testified with respect to this little baby frame there that was in the tub that, well, it could -- the fall on that thing could have caused -- a fall on that could have caused it perhaps or he couldn't rule it out or whatever he said. But the point is the doctor don't know the dyna[m]ics of how it happened. All he can testify is what he kept saying up there that it was due to blunt force trauma and based on the nature of the trauma and the circumstances that he was aware of he had to pigeon hole it to these different categories shown on the death certificate and he happened to pigeon hole [it] in the homicide. There's a lot of testimony about whether he -- how [he] came up with that, but that's -- he had to do that based on the limited circumstances that he was presented with. Now, he kept saying that, but we belabored that point over and over and over and the bottom line is it's not his position -- that's what I have to determine based on all the facts presented in this case whether it was homicide or not. Now, after the autopsy I believe the defendant was arrested and charged with -- presented to a grand jury and they charged him with murder[,] and that's where we are today. But in -- the Court in considering all of the evidence in this case, the defendant's conduct is what the Court -- is the only thing the Court has to focus on, not really the only thing, but it's the main thing the Court focuses on in arriving at what happened to this child[,] and that's circumstantial evidence is what I'm getting at. Circumstantial evidence is what I have to deal with here. I believe the circumstantial evidence that I put the most emphasis on is this agreement that was made between the two parents for her to go to the hospital and tell the doctors that she had caused this injury. I can -- there's no other reasonable explanation of that than to find beyond a reasonable doubt that this was done to protect the actual perpetrator, as it turned out later to be Ron Martin, and I do not believe that they would have concocted such a story if things had happened the way Mr. Martin said they happened when he gave his statement, supposedly

fessing up to the -- to investigators. I simply do not believe that is the way the injuries to this child occurred.

The Court finds beyond a reasonable doubt that the defendant is guilty of manslaughter under 31 -- Revised Statute 31 . . . A (2) (a).

It is not the function of the appellate court to reassess credibility of witnesses or reweigh evidence:

> [The supreme court has] repeatedly cautioned that due process, rational fact finder test of *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), does not permit a reviewing court to substitute its own appreciation of the evidence for that of the fact finder or to second guess the credibility determinations of the fact finder necessary to render an honest verdict. A reviewing court may intrude on the plenary discretion of the fact finder "only to the extent necessary to guarantee the fundamental protection of due process of law."

*State v. Calloway*, 07-2306, p. 10 (La. 1/21/09), 1 So.3d 417, 422 (citations omitted).

"The trier of fact makes credibility determinations and may, within the bounds of rationality, accept or reject the testimony of any witness[.]" *State v. Higgins*, 03-1980, p. 17 (La. 4/1/05), 898 So.2d 1219, 1232, *cert. denied*, 546 U.S. 883, 126 S.Ct. 182 (2005). "Credibility determinations are within the sound discretion of the trier of fact and will not be disturbed unless clearly contrary to the evidence." *State v. Marshall*, 04-3139, p. 9 (La. 11/29/06), 943 So.2d 362, 369, *cert. denied*, 552 U.S. 905, 128 S.Ct. 239 (2007).

The Louisiana Supreme Court has discussed the standard of review for evaluating the sufficiency of the evidence on appeal:

> The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. A determination of the weight of evidence is a question of fact, resting solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witnesses. A reviewing court may impinge on the factfinding function of the jury only to the extent necessary to assure the

7

*Jackson* standard of review. It is not the function of an appellate court to assess credibility or re-weigh the evidence.

*State v. Macon*, 06-481, pp. 7-8 (La. 6/1/07), 957 So.2d 1280, 1285-86 (citations omitted).

"Circumstantial evidence consists of proof of collateral facts and circumstances from which elemental factors may be inferred according to reason, experience and common sense." *State v. Burns*, 441 So.2d 843, 845 (La.App. 3 Cir. 1983).

The statutory rule in evaluating the sufficiency of circumstantial evidence is, "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." La.R.S. 15:438. The Louisiana Supreme Court has explained the "hypothesis of innocence" stating:

Consequently, before a trier of fact can decide the ultimate question of whether a reasonable hypothesis of innocence exists in a criminal case based crucially on circumstantial evidence, a number of preliminary findings must be made. In addition to assessing the circumstantial evidence in light of the direct evidence, and vice versa, the trier of fact must decide what reasonable inferences may be drawn from the circumstantial evidence, the manner in which competing inferences should be resolved, reconciled or compromised; and the weight and effect to be given to each permissible inference. From facts found from direct evidence and inferred from circumstantial evidence, the trier of fact should proceed, keeping in mind the relative strength and weakness of each inference and finding, to decide the ultimate question of whether this body of preliminary facts excludes every reasonable hypothesis of innocence.

*State v. Johnson*, 09-231, p. 6 (La.App. 3 Cir. 11/4/09), 21 So.3d 1159, 1164, *writ denied*, 09-2643 (La. 5/21/10), 36 So.3d 230 (quoting *State v. Chism*, 436 So.2d 464, 469 (La.1983)).

The trial court found that Defendant was guilty of manslaughter under La.R.S. 14:31(A)(2)(a): "Manslaughter is: . . . . A homicide committed, without any intent to cause death or great bodily harm[] [w]hen the offender is engaged in the

perpetration or attempted perpetration of any felony not enumerated in Article 30 or 30.1, or of any intentional misdemeanor directly affecting the person. . . ." Second degree murder includes "the killing of a human being: . . . . When the offender is engaged in the perpetration of cruelty to juveniles, even though he has no intent to kill or inflict great bodily harm." La.R.S. 14:30.1(A)(2)(b). Thus, because cruelty to juveniles is one of the offenses listed in La.R.S. 14:30.1, it is excluded from the statutory definition of manslaughter.

However, Defendant could still validly be convicted of manslaughter based upon evidence sufficient to prove second degree murder because manslaughter is a responsive verdict to second degree murder under La.Code Crim.P. art. 814. "[A]n appellate court will not reverse a [factfinder's] return of a responsive verdict, whether or not supported by the evidence, as long as the evidence is sufficient to support a conviction for the charged offense." *State v. Harris*, 02-1589, p. 4 (La. 5/20/03), 846 So.2d 709, 712-13.

Cruelty to juveniles includes, "[t]he intentional or criminally negligent mistreatment or neglect by anyone seventeen years of age or older of any child under the age of seventeen whereby unjustifiable pain or suffering is caused to said child. Lack of knowledge of the child's age shall not be a defense[.]" La.R.S. 14:93(A)(1).

The evidence most favorable to the prosecution shows that baby Gladys suffered terminal injuries while in Defendant's sole care. The injuries consisted of blunt force trauma caused either by someone hitting the infant in the side of the head or slamming the child's head against another object. Though Defendant and Ms. Newhouse initially claimed the baby had either hit her head on the side of the bathtub or on the floor of the bathtub in a fall, the fatal injury could not have been derived

9

from either of those scenarios as Gladys' autopsy yielded no evidence that the injuries were sustained in a fall. Also, notwithstanding Dr. Traylor's testimony that he could not rule out the injury being caused by a spot located on the baby's bath cot, Dr. Traylor continued on to say that dropping an infant onto the bath seat, even from a height of five feet, would not create enough force to inflict baby Gladys' skull injury. Moreover, although the defense postulated that the infant's injuries were due to normal handling of one afflicted with brittle bone disease, genetic tests showed only a one percent chance that the baby had brittle bone disease, and Dr. Traylor explained that, due to the elastic nature of infant bones, it would take more force to cause this injury to a baby than it would to cause the same or similar injury in an adult. Finally, Defendant's initial efforts to conceal the fact that Gladys was harmed while in his sole care indicates a guilty conscience. *See State v. Aymond*, 08-1292, p. 16 (La.App. 3 Cir. 4/1/09), 8 So.3d 795, 803-04 (citing *State v. Richards*, 06-1553 (La.App. 3 Cir. 5/2/07), 956 So.2d 160, *writ denied*, 07-1129 (La.12/14/07), 970 So.2d 529); *see also*, *State v. Williams*, 42,803, p. 6 (La.App. 2 Cir. 12/5/07), 972 So.2d 1214, 1218, *writ denied*, 08-144 (La. 6/20/08), 983 So.2d 1271 (citing *State v. King*, 41,084 (La.App. 2d Cir. 6/30/06), 935 So.2d 815, *writ denied*, 06-1803 (La. 2/16/07), 949 So.2d 411).

In another circumstantial evidence case involving the death of a child caused by non-accidental brain trauma, this court found sufficient evidence to support the defendant's second degree murder conviction where the defendant was the only person with the opportunity to inflict the injury. *State v. Miller*, 06-595, pp. 6-8 (La.App. 3 Cir. 9/27/06), 940 So.2d 864, 869, *writ denied*, 06-2577 (La. 5/11/07), 955 So.2d 1278. As in *Miller*, there was sufficient evidence presented in the instant case

to support a conviction for second degree murder. Hence, a rational factfinder could have found evidence sufficient to support the responsive verdict of manslaughter.

Accordingly, this assignment of error is without merit.

**ASSIGNMENT OF ERROR NO. 2:**

Defendant also asserts that the State improperly shifted the burden of proof to the defense: "The State's expert speculated about the injury to the baby and shifted the burden to the father to establish some causation when in fact there was no unambiguous fact supporting a finding of homicide." Though Defendant's brief initially sets forth this statement regarding the shifting burden of proof as an assignment of error, there is no corresponding argument contained in the brief. Accordingly, this assignment of error is waived. *See* Uniform Rules—Courts of Appeal, Rule 2-12.4.

**ASSIGNMENT OF ERROR NO. 3:**

Defendant asks this court to consolidate this appeal with that arising from his habitual offender adjudication and sentence: "The appeal should be consolidated with conviction and sentence in one single record with KA 10 - 0951." Defendant posits that both appeals are inseparably joined as a matter of fact and law. Defendant maintains that all sentencing proceedings, including enhanced sentence proceedings, are part of the offense for which the sentence is being imposed.

The State replies that it has no objection to the cases being consolidated. However, it points out that Defendant did not file a motion to quash the habitual offender bill of information objecting to the use of a second docket number while the cases were still before the trial court. The prosecution adds that the defense also failed to file a motion to consolidate the cases for purposes of appeal and that

11

Defendant has further failed to specifically state what, if any prejudice, he has suffered from the dual docket numbers and appeal.

As noted by the State, the record is devoid of any attempt by Defendant to consolidate the cases in either the trial court or this court prior to the filing of his brief. Further, even though Defendant generally and conclusorily alleges prejudice, he lists no specific or particular prejudice. Finally, as Defendant's appeals in the instant case were considered in conjunction with each other, there was no actual prejudice to Defendant.

Accordingly, this assignment of error is without merit.

**_PRO SE_ ASSIGNMENTS OF ERROR NOS. 2, 4, 6-8, & 10:**

Defendant argues several assignments of error that appear to attack the sufficiency of the evidence. In _Pro Se_ Assignment of Error No. 2, Defendant urges, "[t]he Defendant, Ron S. Martin did stipulate to Gladdie (Gladys) [being] in his care, but prosecution's expert witness could not say when exactly the injury occurred." In _Pro Se_ Assignment of Error No. 4, Defendant asserts, "[p]rosecution presented punching or slamming my baby, but was disproven by Defendant's presentation of Goldsmith & Plunkett (Defense Exhibit No. 1) and Defendant's objection, and Defendant's statement of the causation of what happened." In _Pro Se_ Assignment of Error No. 6, Defendant claims, "[t]he State complained of, and alleged numerous scenarios, but none was [sic] proven beyond a reasonable doubt." In _Pro Se_ Assignment of Error No. 7, Defendant contends, "State's expert witness declared that a slip, drop, or fall could not be ruled out." In _Pro Se_ Assignment of Error No. 8, Defendant alleges, "[t]he accidental slip from Defendant's arms was found to have caused a linear fracture to my babies [sic] skull, but expert witness testified that

fracture had enlarged due to the swelling of Gladdie's brain and medical intervention." In *Pro Se* Assignment of Error No. 10, Defendant complains that the pathologist only investigated the cause of death stated by law enforcement: Detective only gave pathologist one (1) causation of my babies [sic] condition, and coersed [sic] the pathologist through the entire autopsy, and pathologist wasn't allowed to make his own professional opinion. Detective's [sic] never gave the pathologist the truth as another causation of her condition. In violation of law, and holding's [sic].

The argument in Defendant's *pro se* brief is restricted to discussing the sufficiency of the evidence. Defendant maintains both that the prosecution failed to prove Defendant was guilty of any criminal activity and that he was convicted because he had prior felonies. Defendant contests both the credibility of the State's evidence and the prosecution's failure to present any evidence favorable to the defense. Defendant further questions the qualifications of the judge and asks this court to vacate his conviction.

As discussed in Assignment of Error No. 1, when the sufficiency of the evidence is reviewed in the light most favorable to the prosecution, any rational factfinder could have found evidence sufficient to support the responsive verdict of manslaughter.

Accordingly, these assignments of error are without merit.

### *PRO SE* ASSIGNMENT OF ERROR NO. 1:

Defendant asserts, "[t]he alleged crime scene was not secured and people were inside the house to taint the evidence, or rearrange or move evidence." Defendant does not include any argument concerning this statement in his *pro se* brief, and there is no objection on the record at pages cited by Defendant. Accordingly, this

assignment of error has been waived. *See* Uniform Rules—Courts of Appeal, Rule 2-12.4; *see also* La.Code Crim.P. art. 841.

## *PRO SE* ASSIGNMENT OF ERROR NO. 3:

Defendant alleges, "Defendant's credibility was attacked without Defendant testifying in violation of Defendants [sic] rights." As before, Defendant does not include any argument concerning this statement in his *pro se* brief, and there is no objection on this basis in the record at the page cited by Defendant. Accordingly, this assignment of error has been waived. *See* Uniform Rules—Courts of Appeal, Rule 2-12.4; *see also* La.Code Crim.P. art. 841.

## *PRO SE* ASSIGNMENT OF ERROR NO. 5:

Defendant contends, "[t]he witnesses, Hope Gaskin, Kendra Calcote, and Pam Newhouses' [sic] statements and testimony is [sic] heresay [sic], and should have been dismissed as such under that rule." Defendant does not include any argument concerning this statement in his *pro se* brief. Accordingly, this assignment of error has been waived. *See* Uniform Rules—Courts of Appeal, Rule 2-12.4.

## *PRO SE* ASSIGNMENT OF ERROR NO. 9:

Defendant claims, "[d]efense objected to witnesses reading from record's [sic], progress report's [sic], synopsis' [sic] verbatim which is in violation of law. Defenses' continuing objection." Defendant does not include any argument concerning this statement in his *pro se* brief. Accordingly, this assignment of error has been waived. *See* Uniform Rules—Courts of Appeal, Rule 2-12.4.

14

## *PRO SE* ASSIGNMENT OF ERROR NO. 11:

Defendant urges, "[p]rosecution's expert witness, Dr. James Traylor, a forensic pathologist was only allowed to give testimony on the fact a death occurred not to the nature of the death." Defendant cites La.Code Crim.P. art. 101 in support of this argument.

Under La.Code Crim.P. art. 101, the coroner is required to investigate suspicious deaths:

> The coroner's jury and inquest are abolished.
>
> The coroner shall conduct an investigation concerning the manner and cause of any death when informed that death has resulted from violence or accident, or under suspicious circumstances.
>
> The coroner may conduct an investigation concerning the medical aspects of any case that may involve medical evidence and in which there is a reasonable probability that a criminal statute has been violated and shall do so when ordered by the court. This order may be issued ex parte by the court either on its own motion or on application by the district attorney.

Therefore, contrary to Defendant's contention, La.Code Crim.P. art. 101 does not prohibit experts in forensic pathology from testifying as to their findings concerning the cause and manner of death.

Accordingly, this assignment of error is without merit.

## *PRO SE* ASSIGNMENT OF ERROR NO. 12:

Defendant asserts, "[t]he introduction of State's exhibit No. 16 was improperly introduced by prosecution and wasn't told to the defense for the chance to defend against." Defendant does not include any argument concerning this statement in his *pro se* brief. Accordingly, this assignment of error was waived. *See* Uniform Rules—Courts of Appeal, Rule 2-12.4.

Moreover, the defense's initial objection to State's Exhibit No. 16 was that the record did not show that it was the bath seat actually used by Defendant and Ms. Newhouse to bathe their infant daughter. The defense was allowed to traverse Ms. Newhouse about whether the bath seat was the one used to bathe Gladys, and Ms. Newhouse confirmed that it was Gladys' bath seat. When State's Exhibit No. 16 was finally admitted into evidence, there was no objection by the defense. Accordingly, Defendant is also barred from raising this issue on appeal as there was no contemporaneous objection. *See* La.Code Crim.P. art. 841.

**DECREE:**

Defendant's conviction is affirmed.

**AFFIRMED.**